SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF New York

```
-------------------------------------------------x
SBAV LP,

                    Plaintiff/Petitioner,

        - against -

Porter Bancorp, Inc., PBI Bank, Inc., J. Chester
Porter and Maria L. Bouvette,

                    Defendant/Respondent.
-------------------------------------------------x
```

Index No. 654398/12

## NOTICE OF COMMENCEMENT OF ACTION
## SUBJECT TO MANDATORY ELECTRONIC FILING

PLEASE TAKE NOTICE that the matter captioned above, which has been commenced by filing of the accompanying documents with the County Clerk, is subject to mandatory electronic filing pursuant to Section 202.5-bb of the Uniform Rules for the Trial Courts.  This notice is being served as required by Subdivision (b) (3) of that Section.

The New York State Courts Electronic Filing System ("NYSCEF") is designed for the electronic filing of documents with the County Clerk and the court and for the electronic service of those documents, court documents, and court notices upon counsel and self-represented parties. Counsel and/or parties who do not notify the court of a claimed exemption (see below) as required by Section 202.5-bb(e) must immediately record their representation within the e-filed matter on the Consent page in NYSCEF. Failure to do so may result in an inability to receive electronic notice of document filings.

Exemptions from mandatory e-filing are limited to: 1) attorneys who certify in good faith that they lack the computer equipment and (along with all employees) the requisite knowledge to comply; and 2) self-represented parties who choose not to participate in e-filing. For additional information about electronic filing, including access to Section 202.5-bb, consult the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center at 646-386-3033 or efile@courts.state.ny.us.

Dated: 12/17/2012

_S/_ _____ (Signature)

| Beth I.Z. Boland | (Name) |
| Bingham McCutchen LLP | (Firm Name) |

One Federal Street _____ (Address)
Boston, MA 02110

_____

617-951-8000 _____ (Phone)

beth.boland@bingham.com (E-Mail)

To:    The Above Defendants

_____

_____

4/8/11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. **654398/12**

------------------------------------------------------------------x

SBAV LP,

                                          Plaintiffs,

Date Purchased:

**12-17-12**

        -against-

**SUMMONS**

PORTER BANCORP, INC., PBI BANK, INC.,
J. CHESTER PORTER,
and MARIA L. BOUVETTE,

Venue is based on Plaintiff's
place of business at 9 West
57th Street, New York, New
York 10019.

                                          Defendants.

------------------------------------------------------------------x

To the above-named Defendants:

        YOU ARE HEREBY SUMMONED to answer the complaint in this action and serve a
copy of your answer, or, if the complaint is not served with this summons, to serve a notice of
appearance, on plaintiff's attorneys within twenty (20) days after service of this summons,
exclusive of the day of service (or within thirty (30) days after the service is complete if this
summons is not personally delivered to you within the State of New York); and in case of your
failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the complaint.

Dated: New York, New York
        December 17, 2012

                        **BINGHAM McCUTCHEN LLP**

                        By: s/ Beth I.Z. Boland
                                Todd B. Marcus
                                Colleen J. O'Loughlin
                                Bingham McCutchen LLP
                                399 Park Avenue
                                New York, New York 10022-4689
                                (212) 705-7000

                                Beth I.Z. Boland
                                Bingham McCutchen LLP
                                One Federal Street
                                Boston, MA  02110
                                (617) 951-8000

A/75308296

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------x

SBAV LP,

            Plaintiffs,

   -against-

PORTER BANCORP, INC., PBI BANK, INC.,
J. CHESTER PORTER,
and MARIA L. BOUVETTE,

            Defendants.

------------------------------------------------------------------x

Index No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

   Plaintiff SBAV LP ("SBAV"), by its attorneys, Bingham McCutchen LLP, as and for its complaint as against defendants Porter Bancorp, Inc. ("Porter Bancorp" or "the Company"), PBI Bank, Inc. (together with the Company, the "Bank"), J. Chester Porter ("Porter"), and Maria L. Bouvette ("Bouvette") (collectively, Porter Bancorp, Porter, and Bouvette are referred to herein as "Defendants"), alleges as follows:

**Preliminary Statement**

   1.  This action arises out of Porter Bancorp's material misrepresentations to a potential investor, SBAV, at a time when the Company was desperate to raise capital in order to meet its ongoing regulatory capital requirements and the Bank's two controlling shareholders (then-Chairman J. Chester Porter and then-President/CEO, Maria Bouvette) were equally desperate to retain their majority control over the Company. By misleading SBAV and other investors about the true financial condition of the Company and its wholly owned bank subsidiary, PBI Bank, Porter Bancorp and its controlling shareholders sought to inflate the value of the Company and minimize the dilutive effects of the much-needed capital raise by selling the fewest number of shares at the highest possible price. And by raising capital when it did, the

Company ensured that it had a capital cushion to meet regulatory requirements even when it later revealed the true and sorry state of its balance sheet.

2.     In deciding to invest in the Company, SBAV relied upon the Company's SEC-filed financial statements as well as the written and oral representations by the Bank, Porter, and Bouvette. The Bank and its controlling shareholders painted a picture of a stable bank which had dealt appropriately with its book of loans in the wake of the financial and real estate crisis. They represented to SBAV that problem loans had been classified appropriately, that adequate reserves had been taken against their balances, that real estate owned by the Bank upon foreclosure or other legal processes (known as Other Real Estate Owned, or "OREO") had been valued at "fair market" value on the Bank's balance sheet, and that the Bank had adequate financial and disclosure controls and sufficient expertise to evaluate its loan book and OREO. In raising more than $30 million from investors like SBAV, these representations were critical. Unfortunately for SBAV, they were also false.

3.     Unbeknownst to SBAV, the day before SBAV committed to invest in Porter Bancorp, the U.S. Securities and Exchange Commission formally questioned the Company's disclosure practices and internal controls. Soon thereafter, no less than three other federal and State regulators pounced on the Bank, questioning its accounting and disclosure practices, demanding changes in processes and valuation procedures and insisting on compliance with various rules, regulations and laws that the Bank was, in the eyes of the regulators, violating. In order to comply with the regulators' demands, the Bank started classifying its loan book more appropriately, taking proper levels of reserves against that loan book, and more accurately valuing its OREO. The effects of coming clean were astounding to all investors, including SBAV: in 2011 (the year after SBAV's investment) and against a backdrop of relative economic

2

stability in Kentucky, the Bank lost $105 million -- a huge sum given that the Bank had generated only $80 million in total profits for the prior seven years combined. For SBAV, it was too late. Porter Bancorp already had SBAV's money.

4.      Not surprisingly, the stock that SBAV purchased on false information in July 2010 has since plummeted in value. The securities which SBAV bought at $11.50 per share now trade at less than $1.00 per share. Having suffered over $4.5 million in damages as a result of Defendants' misrepresentations, and despite numerous attempts to obtain relief from the Bank, SBAV now brings this complaint against Porter Bancorp, Porter, and Bouvette for violations of the Kentucky Uniform Securities Act, and for misrepresentation and breach of contract.

## PARTIES

5.      SBAV is and, at all relevant times hereinafter mentioned, was a limited partnership organized and existing under the laws of the State of Delaware with a principal place of business at 9 West 57th Street, New York, New York. The General Partner of SBAV is SBAV GP LLC, a limited liability company managed by George Hall, its Managing Member.

6.      Porter Bancorp is and, at all relevant times hereinafter mentioned, was a corporation organized and existing under the laws of the State of Kentucky with a principal place of business at 2500 Eastpoint Parkway, Louisville, Kentucky 40223. Porter Bancorp is a bank holding company regulated by the Federal Reserve Bank of St. Louis; its wholly-owned subsidiary PBI Bank is a community bank organized and existing under the laws of the State of Kentucky with a principal place of business at 2500 Eastpoint Parkway in Lousville, Kentucky, which is regulated by the Federal Deposit Insurance Corporation and the Kentucky Department of Financial Institutions.   Upon information and belief, Porter is and, at all relevant times

3

hereinafter mentioned, was an individual and resident of the State of Kentucky.  Until March 29, 2012, Porter served as Chairman of Porter Bancorp.

7.    Upon information and belief, Bouvette is and, at all relevant times hereinafter mentioned was an individual and resident of the State of Kentucky.  Bouvette serves as Chairman and Chief Executive Officer of Porter Bancorp, but stepped down as President of Porter Bancorp and as President/Chief Executive Officer of PBI Bank as of July 19, 2012.  She remains Chairman of PBI Bank.

### JURISDICTION AND VENUE

8.    This Court has personal jurisdiction over the Defendants, inasmuch as the causes of action alleged herein arise from the Defendants having transacted business in the State of New York because the offer or sale of securities by Defendants to SBAV occurred in New York, New York.  In particular, the offering of securities was effectuated by a broker/dealer whose principal place of business is located in New York, New York

9.    Venue is proper pursuant to N.Y. C.P.L.R. § 503 because SBAV has a usual place of business in New York County, New York.

### FACTS COMMON TO ALL CAUSES OF ACTION

A.    **Porter Bancorp Needs to Raise Capital**

10.    Porter Bancorp is a small, publicly-traded bank holding company (NASDAQ: PBIB) headquartered in Louisville, Kentucky.  Through its wholly owned subsidiary PBI Bank, it operates 18 banking offices throughout Kentucky.  PBI Bank is a traditional community bank offering commercial and personal banking products, including residential and commercial real estate loans. The Company completed its initial public offering in September 2006.  As of

4

December 31, 2011, the Bank had total assets of $1.5 billion, total net loans of $1.1 billion, total deposits of $1.3 billion and stockholders' equity of $83 million.

11.     Porter Bancorp is controlled by Porter and Bouvette. At all relevant times, Porter served as Porter Bancorp's Chairman of the Board of Directors and recently resigned that position to become Chairman Emeritus, and Bouvette served as the President and Chief Executive Officer of the Company and PBI Bank, and recently resigned as President and Chief Executive Officer of PBI Bank and succeeded Porter as Chairman of Porter Bancorp's Board of Directors. At all relevant times, Porter and Bouvette, together, owned and controlled over 50% of Porter Bancorp's issued and outstanding shares of common stock.

12.     Porter Bancorp's stock is thinly-traded, with approximately 12,000,000 issued and outstanding shares of commons stock and a historical average trading volume of 3,000 to 4,000 shares per day.

13.     At or around the time Porter Bancorp filed its 2009 annual report in early 2010, Porter Bancorp, Porter, and Bouvette recognized a need for the Bank to raise capital in order to continue to comply with various capital requirements imposed by federal and state regulators and to repay its TARP funds (funds borrowed under the United States Government's Troubled Asset Relief Program).

14.     Upon information and belief, Defendants each were aware that the Bank's balance sheet was overstated, inaccurate and prepared in violation of generally accepted accounting principles (GAAP), in that (a) the Bank was carrying on its balance sheet OREO at valuations far in excess of then-current fair market values; (b) the Bank's classifications of loans were incorrect and failed to account for current performance and conditions of the loans, collateral and borrower credit; and (c) the Bank's reserve accounts were woefully inadequate given what the

5

Defendants knew about the performance of the loans, value of the underlying collateral, credit quality of the borrowers, proper classification of loans and likely inflows to non-performance asset ("NPA") classes.

15.     Had the Defendants corrected these balance sheet misrepresentations, the Bank would have had inadequate capital under the various regulatory frameworks that apply to it and its subsidiary bank.

16.     With knowledge of the over-inflated and false balance sheet, and the likelihood that regulators or others would eventually require the Bank to correct its accounting, Porter Bancorp, at the direction of its controlling shareholders Porter and Bouvette, determined to raise capital by way of a "private investment in pubic equities," or "PIPE," transaction.

**B.     Porter Bancorp Raises Capital Through a PIPE Transaction**

17.     As part of the initial PIPE transaction, on or about June 30, 2010, Porter Bancorp entered into a private placement of securities to certain investors, for aggregate gross proceeds of $27 million, in exchange for the sale and issuance of: (a) 1,755,747 shares of common stock for $11.50 per share; (b) 227,000 shares of Cumulative Mandatory Convertible Perpetual Preferred Stock, Series B ("Series B Preferred Stock") for $11.50 per share; and (c) 365,080 shares of Non-Voting Mandatory Convertible Preferred Stock, Series C for $11.50 per share; and (d) warrants to purchase 1,163,045 shares of convertible non-voting common stock ("Non-Voting Common Stock") at a purchase price of $11.50 per share.

18.     In late June 2010 at a meeting at SBAV's offices in New York, an investment bank engaged by Porter Bancorp suggested that SBAV consider investing in the Bank. SBAV conducted an initial review of the Bank, relying on information supplied by the Bank and other public information such as quarterly and annual financial statements filed by Porter Bancorp

A/75308296

with the U.S. Securities and Exchange Commission. This information was supplied by the Bank by means of, *inter alia*, phone calls and emails to and from SBAV in New York.

19.     Based on the financial information available to SBAV, SBAV expressed an interest in meeting with Bouvette and other officers of the Bank in Kentucky. On or about July 13, 2010, representatives from the Clinton Group, Inc., SBAV's investment manager, met with Bouvette and other executive officers of Porter Bancorp at the offices of the Bank. During these discussions, Bouvette said that the Bank had, like many banks during the financial crisis, made some bad loans but characterized the Bank as "aggressive" in moving loans into non-performing status and taking appropriate reserves and write-downs. Bouvette said that the OREO properties were valued on the balance sheet at prices that reflected fair value for those assets (i.e. prices that could be achieved in a sale between a willing seller and a willing buyer at that time) and that the Bank would act quickly to sell its portfolio of OREO so that it could grow again. Together, Bouvette said, the Bank and its investors would be in a position to grow the bank, acquire weaker banks in the region, and create a strong economic enterprise. Bouvette expressed confidence in the processes, people and systems at the Bank and in the manner assets were marked on the Bank's accounting books.

20.     Porter Bancorp's financial statements then on file with the SEC seemed to support these representations, and painted the false picture of a Bank that was relatively stable, well inside of regulatory capital requirements and, by some measures, actually improving. At the time of SBAV's investment in the Supplemental Private Placement, the Bank's most recent financial information on file with the SEC were its 2009 Form 10-K filed March 16, 2010, and signed by Porter and Bouvette (the "2009 10-K") and its Form 10-Q for the first quarter of 2010 filed May 11, 2010, and signed by Bouvette (the "1st Quarter 2010 10-Q"). Bouvette certified

A/75308296

that the information contained in the 1st Quarter 2010 10-Q "fairly presents, in all material respects, the financial condition and results of operations of" Porter Bancorp.  Porter Bancorp also provided SBAV with an oral summary of the Bank's second quarter financials at the time SBAV invested.

21.    Based on the SEC filed financials and the summary of the second quarter financials, the Bank appeared to be stable or improving. The Bank's NPAs actually declined from $120.2 million in the first quarter of 2010 to $117.2 million  in the second quarter of the year, suggesting that the Bank's non-performing assets were shrinking. The Allowance for Loans and Leases account (the account that recognizes expected future losses on the existing loans) was relatively stable, growing modestly from $26.5 million to just $26.8 million. With assurances from Porter Bancorp's executive officers that the Bank had strong procedures and controls in place, SBAV believed these financial disclosures were accurate and were indicative of a bank that was turning the corner, ready to improve and grow.

22.    In light of and in reliance upon these representations, on or about July 23, 2010, SBAV entered into a letter agreement dated as of July 23, 2010, with Porter Bancorp (the "Letter Agreement"), and Porter Bancorp completed a supplemental private placement on comparable terms as the purchasers in the Private Placement (the "Supplemental Private Placement").  The Letter Agreement incorporated the terms of the Securities Purchase Agreement, the Voting and Support Agreement, and the Registration Rights Agreement which were part of the initial Private Placement; collectively, the initial Private Placement and the Supplemental Private Placement are referred to as the "Private Placements." Because Porter Bancorp already had issued common stock equal to 19.9% of its common stock outstanding before the initial Private Placement, and the number of shares of Porter Bancorp's authorized and unissued preferred stock remaining

8

after the Private Placement was limited the Supplemental Private Placement was structured slightly differently from the Private Placement.

23.     In the Supplemental Private Placement, Porter Bancorp received from SBAV gross proceeds of $4,255,000 in exchange for the sale and issuance of (a) 370,000 shares of Series B Preferred Stock at $11.50 per share, and (b) a Warrant to purchase 185,000 shares of Non-Voting Common Stock at a purchase price of $11.50 per share.  On September 16, 2010, Porter Bancorp's shareholders approved the conversion of SBAV's Series B Preferred Stock into the same number of common shares.

24.     In addition, Porter Bancorp granted to SBAV an option to purchase both 64,784 shares of common stock and a Warrant to purchase 32,392 shares of Non-Voting Common Stock at a purchase price of $11.50 per share.  The option exercise price was $745,016, exercisable during the five business days following shareholder approval at a special meeting.   On September 27, 2010, SBAV exercised its options, bringing to $5,000,016 the total gross proceeds received by Porter Bancorp in the Supplemental Private Placement.

25.     On or about December 1, 2010, Porter Bancorp (a) paid to its shareholders a 5% stock dividend resulting in the receipt by SBAV of an additional 21,740 shares of Porter Bancorp common stock, and (b) issued to SBAV a warrant to purchase 10,869 shares of common stock for $11.50 per share.  SBAV did not exercise its rights under this warrant, which expired worthless on August 6, 2011.

26.     In the Securities Purchase Agreement and the Letter Agreement, as well as in oral statements made by representatives of the Bank, Porter Bancorp made to SBAV a number of representations and warranties regarding the financial condition and soundness of the Bank, the effectiveness of its internal controls, and the accuracy of its financial reporting.

9

A/75308296

27.     In addition to the statements made by Bouvette and Porter to SBAV, Porter Bancorp represented and warranted to SBAV that:

(a)     Porter Bancorp had no liabilities or obligations required to be disclosed in the SEC Reports but not so disclosed in the SEC Reports ... which, individually or in the aggregate, will have or would reasonably be expected to have a Material Adverse Effect.[1] (Securities Purchase Agreement § 3(g).)

(b)     Porter Bancorp's SEC Reports complied in all material respects with the requirements of the Securities Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, and none of the SEC Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. (Securities Purchase Agreement § 3(h).)

(c)     Porter Bancorp's financial statements included in the SEC Reports complied in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing.  Such financial statements have been prepared in accordance with GAAP applied on a consistent basis during the periods involved, except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the balance sheet of the Company and its consolidated subsidiaries taken as a whole as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal year-end audit adjustments, which would not be material, either individually or in the aggregate.  (Securities Purchase Agreement § 3(i).)

(d)     Since the date of the latest audited financial statements included within the SEC Reports filed prior to the date of the Letter Agreement, the businesses of the Company and its Significant Subsidiaries have been conducted only in the ordinary course, in substantially the same manner as theretofore conducted, and there has not occurred since December 31, 2008, any event that has had a Material Adverse Effect. (Securities Purchase Agreement § 3(k).)

(e)     Except as set forth in the SEC Reports on files as of the date of the Securities Purchase Agreement, Porter Bancorp maintains internal control over financial reporting (as such term is defined in Rule 13a-15 under the Exchange Act) designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and such

---

[1] Capitalized terms have the meanings ascribed to them in the Securities Purchase Agreement.

10

A/75308296

internal control over financial reporting is effective.  (Securities Purchase Agreement § 3(u).)

(f)     All reports, registrations, and statements, together with any required amendments thereto, filed with the Federal Reserve, the FDIC, the DFI, and any other applicable federal or state securities or banking authorities, complied as to form in all material respects with all the rules and regulations promulgated by the Federal Reserve, the FDIC, the DFI, and any other applicable federal or state securities or banking authorities, as the case may be.  (Securities Purchase Agreement § 3(kk).)

(g)     At the Closing Date . . . both Porter Bancorp and PBI Bank will have a Tier 1 capital at a level equal to or exceeding 9 percent of total assets, and total risk-based capital at a level equal to or exceeding 12 percent of total risk-based assets. (Securities Purchase Agreement § 3(tt).)

(h)     As of the date of the Letter Agreement and as of the Closing Date, Porter Bancorp's management has concluded the loan loss reserves of PBI Bank are adequate. (Securities Purchase Agreement § 3(uu).)

28.     In addition, Porter Bancorp agreed to indemnify Plaintiff for any losses incurred by reason of any breach by the Bank of its representations and warranties.  Section 4.8(a) of the Securities Purchase Agreement requires Porter Bancorp:

[t]o indemnify and hold each Purchaser . . ., each Person who controls such Purchaser (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) . . . (each, a *"Purchaser Party"*) harmless from any and all losses, . . . damages, costs and expenses, including all . . . court costs and reasonable attorneys' fees and costs of investigation that any such Purchaser Party may suffer or incur as a result of (i) any breach of any of the representations, warranties, covenants or agreements made by the Company in this Agreement or in the other Transaction Documents . . . .

## C.     The Effect of the Private Placements on the Bank's Shareholder Base

29.     The timing and scope of the Private Placements were not coincidental, but rather were designed to minimize the dilutive effects upon the shareholdings of Porter and Bouvette in order to allow them to retain control of the Company while still raising as much capital as possible.

11

A/75308296

30.     Prior to the Private Placements, Porter and Bouvette were together the beneficial owners of approximately 65% of the issued and outstanding shares of Porter Bancorp.  By maintaining a share price of $11.50 in the Private Placements, the Company was able to raise over $30 million in additional capital through the sale of approximately 2,350,000 shares of Series B Preferred and common stock.

31.     After the closing of the Private Placements, Bouvette and Porter maintained 54.5% of the voting shares of Porter Bancorp.  To this day, Porter and Bouvette together control slightly over 50% of the Company's voting shares.

**D.     Porter Bancorp Failed to Disclose the Deterioration of its Financial Position and the Receipt of a Negative Comment Letter from the SEC by July 23, 2010**

32.     Unbeknownst to SBAV, by the time it signed the Supplemental Private Placement agreement on July 23, 2010, the Company had just received a scathing comment letter from the Securities and Exchange Commission with respect to its disclosures in its 2009 10-K and its 1st Quarter 10-Q.  In the wake of the Company's filing of its 2009 10-K and its 1st Quarter 10-Q, the SEC conducted a review of those filings, and provided its comments in writing to Porter Bancorp.  On July 22, 2010, the SEC issued by facsimile to the Company a comment letter (the "SEC Comment Letter") forcefully questioning, *inter alia,* the Company's disclosures of the value of the Bank's OREO in its 2009 10-K and in its Form 10-Q for the first quarter of 2011.

33.     In the letter, the SEC proffered a host of pointed questions reflecting its skepticism about the Bank's valuation of its real estate loan portfolio, including:

a)     Questioning the adequacy of the Bank's disclosures related to restructured loans, including but not limited to explanation of the Bank's loan modification program, how and when loans are restructured, the Bank's non-accrual policies for restructured

12

loans, and how the change in present value of non-accruing loans are reflected in the Bank's financial statements;

b) Requesting an explanation of the relatively large decrease in the Bank's coverage ratio of the allowance for loan losses to nonperforming loans between 2008 and 2009, as well as the appraisal process and valuation of the Bank's OREO holdings. The coverage ratio stood at 92% as of December 31, 2008, but had fallen to 31% by December 31, 2009 and increased again to 44% by March 31, 2010;

c) Seeking information concerning the Bank's process for and circumstances under which the Bank appraised the collateral underlying impaired loans, and how the estimates of or adjustments to those values were reflected in the Bank's financial statements; and

d) Questioning the Bank's conclusion that the foreclosure of a $17.6 million loan on a residential construction and development project and its reclassification as OREO had "no effect" on its provision or allowance for loan losses.

34. Despite the fact that Porter Bancorp received the SEC Comment Letter the day *before* SBAV's purchase of Bank securities in the Supplemental Private Placement, the Company knowingly withheld from SBAV the agency's highly material comments and its questioning of the Bank's valuation of its real estate portfolio and the red flags raised thereby. Indeed, Porter Bancorp did not disclose the existence of the SEC Comment Letter or the serious issues raised by the agency until at least July 30, 2010.

35. Porter Bancorp did not file its Form 10-Q for the second quarter of 2010 (the "2nd Quarter 2010 10-Q") until August 16, 2010. In the wake of the SEC Comment Letter, the

13

Company changed the description of how the Bank performed reviews of its OREO portfolio. In the 1st Quarter 2010 10-Q, as in its 2009 10-K, the Company represented:

> OREO is evaluated at the time of acquisition and recorded at fair value as determined by **independent** appraisal or internal market evaluation less cost to sell. OREO is further evaluated quarterly for impairment.

After the SEC's pointed questioning of the truth of that representation, the Company changed its disclosure, presumably to more accurately describe its approach, to reveal that its OREO appraisals were not conducted by independent appraisers, and they were not prepared on a quarterly basis. Rather, in its 2nd Quarter 2010 10-Q, the Company confessed:

> To determine the fair value of OREO for . . . larger dollar commercial real estate properties, we obtain a new appraisal of the subject property in connection with the transfer to other real estate owned. . . . **We do not obtain updated appraisals on a quarterly basis after the receipt of the initial appraisal.** Rather, we internally review the fair value of the other real estate owned in our portfolio on a quarterly basis to determine if a new appraisal is warranted based on the specific circumstances of each property.

36.     Conspicuously absent from this statement was the Bank's previously oft-repeated mantra that the values of OREO were determined by an "independent" appraisal.   Indeed, they were not.   Upon information and belief, some of the appraisals which formed the basis for the Bank's valuation of its real estate assets and collateral were performed by Porter's son, Jack Porter.  This conflict also directly contravened the Bank's published policies and its Code of Business Conduct & Ethics concerning conflicts of interest.

**E.     More Regulators Aggressively Question The Bank's Methods And Valuations**

37.     Not surprisingly, the SEC was not the only regulatory agency deeply disturbed by the Bank's unsupported approach to valuation of its real estate loan portfolio and its lack of appropriate systems and controls, as well as the potential impact on its already-thin capital cushion once the portfolio became appropriately valued.  In a stinging rebuke, the Federal

14

Deposit Insurance Corporation (the "FDIC") and the Kentucky Department of Financial Institutions ("KDFI"), on the one hand, and the Federal Reserve Bank of St. Louis (the "Federal Reserve"), on the other, also imposed severe sanctions upon PBI Bank and Porter Bancorp, respectively, in the wake of their examinations conducted in late 2010 and early 2011.

38.     The FDIC and KDFI undertook an examination of PBI Bank in the fall of 2010. The examination by the FDIC and KDFI resulted in the issuance of a joint report of examination dated January 3, 2011 (the "Joint Report of Examination").

39.     Upon information and belief, based on their examinations, the FDIC and KDFI determined that PBI Bank engaged in unsafe or unsound banking practices and violations of law, rule, or regulation, and advised PBI Bank of its right to receive formal notice of these charges and of a hearing.

40.     Upon information and belief, PBI Bank waived its right to formal notice of the charges and to a hearing and entered into a stipulation and consent to the issuance of a consent order with the FDIC and KDFI dated June 24, 2011 (the "Consent Order") by which PBI Bank agreed, among other things, to "eliminate and/or correct all violations of law, rule and regulations listed in the" Joint Report of Examination. PBI Bank also agreed:

(a)     to immediately hire an independent expert consultant to evaluate PBI Bank's executive officers, senior credit staff members, and senior vice president commercial loan officers "for the purpose of providing qualified management of [PBI] Bank," and to determine whether these individuals possess the ability, experience, and other qualifications required to perform present and anticipated duties including, but not limited to, adherence to the Bank's established policies and practices, and restoration and maintenance of the Bank in a safe and sound condition;

15

(b)     to maintain its level of Tier 1 capital as a percentage of its total assets at a minimum of nine percent (9%) and its level of qualifying total capital as a percentage of risk-weighted assets at a minimum of twelve percent (12%);

(c)     to adopt a written plan to reduce (defined as collect, charge off, sell, or improve the quality as to warrant removal of any adverse classification) the PBI Bank's risk position in each asset in excess of $1,000,000 classified as "Substandard" in the Joint Report;

(d)     to cause its Board of Directors to review the adequacy of PBI Bank's ALLL (Allowance for Loan and Lease Losses), provide for an adequate ALLL, and accurately report the same;

(e)     to develop and implement procedures which strengthen the PBI Bank's loan review function and ensure the timely and accurate grading of PBI Bank's credit relationships;

(f)     to eliminate from its books, by charge-off or collection, all assets or portions of assets classified "Loss" as of January 3, 2011, that had not been previously collected or charged off; and

(g)     to provide "an accurate description of the financial condition of [PBI] Bank. . . and other material disclosures necessary to comply with Federal securities laws" if it were to raise capital.

41.     Hard on the heels of the FDIC/KDFI Consent Order, on or about September 21, 2011 the Company then was forced to enter into a written agreement with the Federal Reserve with respect to the financial soundness of Porter Bancorp (the "Federal Reserve Agreement"). In and by the Federal Reserve Agreement, Porter Bancorp agreed, *inter alia*:

16

(h)    that Porter Bancorp's Board of Directors would utilize fully the Bank's financial and managerial resources to serve as a source of strength to PBI Bank including, but not limited to, taking steps to ensure PBI Bank complies with the Consent Order, and any other supervisory action taken by federal or state regulator;

(i)    not to (i) declare or pay any dividends without the prior written approval of the Federal Reserve and the Director of the Division of Banking Supervision and Regulation of the Board of Governors (the "Director"), (ii) directly or indirectly take from the Bank dividends or any other form of payment representing a reduction in capital without the prior written approval of the Federal Reserve, (iii) make any distributions of interest, principal, or other sums on subordinated debentures or trust preferred securities without the prior written approval of the Federal Reserve and the Director;

(j)    to submit within sixty days to the Federal Reserve (i) an acceptable written plan to maintain sufficient capital on a consolidated basis, and (ii) a written statement of Porter Bancorp's planned sources and uses of cash for debt service, operating expenses, and other purposes for 2012, with written statements for subsequent years submitted at least on month prior to the beginning of that calendar year; and

(k)    not to directly or indirectly incur, increase, or guarantee any debt, or purchase or redeem any shares of its stock, without the prior written approval of the Federal Reserve.

42.    Given the proximity and sweep of the reforms demanded by the Federal Reserve, the FDIC, the KDFI, and the SEC shortly after the Supplemental Private Placement, it is clear that Porter Bancorp's assurances regarding the adequacy of its internal systems and controls in July 2010 was demonstrably and knowingly false.

17

43.     Indeed, by the end of 2011 the Bank finally admitted as much. In the Company's Form 10-K for the period ending December 31, 2011, the Bank stated that its internal process for assessing loan grades "did not always result in an accurate grade for the credit risk. . . . [W]e identified the extent to which our loan review controls did not operate and expanded their scope to cover the reminder of the portfolio and adjusted our allowance for loan losses . . . Based on its assessment, Management believes that . . . the Company's internal control was not effective in achieving [these] objectives."

F.     **Porter Bancorp Implements New Processes and Procedures, Resulting in a Dramatic Change in the Bank's Financial Performance and Personnel**

44.     In the wake of these damning regulatory findings and consent decrees, the Bank undertook a host of measures which finally forced it to reflect more accurately the value of its real estate assets and collateral, the proper classification of loans, and the appropriate reserves on account of properly classified assets. With regulators pressuring the Bank to finally mark its assets accurately, the Bank reluctantly admitted the poor quality of its loan book and over-valuation of its real estate. These losses ultimately have left the Bank under-capitalized under relevant regulatory guidelines and under the scrutiny of three separate sets of regulators who have entered into separate consent orders regarding the operation of the Bank.

45.     After its investment, SBAV became aware of numerous instances of deficient valuation and valuation processes relating to the Bank's OREO properties. On information and belief, these specific instances are mere examples of pervasive problems that plagued the Bank's processes prior to SBAV's investment, causing the Bank's financial statements to be materially wrong. SBAV is aware, for example, that:

(a)     for an OREO property known as Harrod's Creek Condominiums, a 36-unit, six building complex developed along Harrod's Creek in Prospect, Kentucky, the

18

Bank possessed only a partial appraisal which did not contain such basic information as a description of the subject property or the relevant market;

(b)     for an OREO property known as Spencer County Group, a property comprised of 146.73 acres of residentially zoned land, 76 finished residential lots, a partially completed clubhouse situated on 5.71 acres and a sewer treatment plant situated on 5 acres, the Bank's appraisal contained overly aggressive periods of absorption, failed to consider anticipated expenses for advertising and marketing, utilized out-dated sales data, and failed to consider the condition of the property;

(c)     for an OREO property known as Polo Properties, consisting of 157.56 undeveloped acres zoned for residential use, the Bank's appraisal utilized outdated comparable sales with no discussion as to adjustment for current market conditions, physical size, infrastructure, sewer capacity, or any discussions with investors to support the appraised values;

(d)     for an OREO property known as Floyd Clark, consisting of 71.736 acres of residentially zoned land, the Bank's appraisal did not contain location maps, comparable sales maps (to ascertain the location relative to the subject property), a detailed discussion of the adjustment process (comparing the subject property to those considered "comparable"), or detailed comparable sales sheets. In addition, the Bank's appraisal did not contain information as to any approvals, permits, or infrastructure for the property. Moreover, the comparable sales utilized in the appraisal were outdated and there was no discussion in terms of the comparable sales as to their approvals, topography, or reason for adjustments; and

(e)     for an OREO property known as Whispering Oaks Subdivision, consisting

19

A/75308296

of 16.907 acres -- 3.507 improved acres with approvals for 20 planned unit development units (five four-plex flats) and 13.4 acres approved for 62 units of four-plexes and row type patio homes -- the Bank's appraisal did not contain location maps, comparable sales maps (to ascertain the location relative to the subject property), a detailed discussion of the adjustment process, or comparable sale sheets.

46.     On information and belief, these are but examples of the insufficiency of the Bank's valuation process and represent precisely the sort of *ad hoc* valuation that banking and securities regulators do not permit. These specific examples also demonstrate that Porter Bancorp's representations to SBAV were patently false: the Bank did not in fact comply with rules and regulations promulgated by the relevant regulators, nor were the Bank's controls adequate or its valuations accurate.

47.     The Bank did not even sufficiently document its *ad hoc* approach to its portfolio. Upon information and belief, employees of the Bank were encouraged not to document facts in writing that could be seen as negative from a credit or valuation perspective, leaving the Bank with no means to perform internal audits or to have effective controls over the classifications of loans or the values of real estate.

48.     Once the Bank reformed its processes and procedures with respect to the valuation of its real estate assets and collateral, the proper classification of loans, and the appropriate reserves on account of properly classified assets, it resulted in a striking deterioration of the Bank's financial condition, its capital reserves, and its stock price.  For example,

(f)     for the three months ended March 31, 2011, Porter Bancorp reported net income of only $799,000, as compared with $3.3 million for the same period in 2010 (prior to Porter Bancorp's capital raising efforts) (PBIB Form 10-Q dated May 16, 2011);

20

A/75308296

(g)      for the three and six months ending June 30, 2011, Porter Bancorp reported net losses of $40.0 million and $39.2 million, respectively, as compared to a net loss of only $1.1 million and net income of $2.1 million, respectively, for the same periods in 2010 -- the three and six month periods immediately prior to Porter Bancorp's capital raising efforts (PBIB Form 10-Q dated August 15, 2011);

(h)      for the three and nine month periods ending September 30, 2011, Porter Bancorp reported net losses of $12.2 million and $50.8 million, respectively, as compared to net income of $1.8 million and 3.0 million for the three and nine months ended September 30, 2010 (PBIB Form 10-Q dated November 10, 2011);

(i)      for the year ending December 31, 2011, Porter Bancorp reported net loss of $107.3 million, as compared to a net loss of $4.4 million for the year ending December 31, 2010 (PBIB 2011 Form 10-K dated March 30, 2012); and

(j)      during 2011, the Bank took several separate write-downs on its OREO portfolio as it all-but admitted the valuations on its balance sheet when SBAV invested were significantly overstated relative to fair market value; and

(k)      during 2011, the Bank's reserve account for loans and leases ballooned from $34.3 million to $52.6 million, as the Bank finally started to accurately depict its loan book.

49.      In total, Porter Bancorp has hemorrhaged over $100 million in losses since the Supplemental Private Placement in July 2010.  This free-fall has been accompanied by a commensurate collapse of the Porter Bancorp's stock, which has dropped over 90% from $11.50 a share to now less than $1.00 a share.

21

50.     These catastrophic results occurred despite little change in the underlying credit quality of the borrowers or market for real estate. As of the end of 2011, Kentucky real estate prices were up year-over-year and quarter-over-quarter. GDP in Kentucky was up significantly in 2010 over 2009, performing in the top quintile of states, with Louisville much stronger than Kentucky overall. And according to federal data, personal income in Kentucky increased in each of the five quarters from the time of SBAV's investment through the end of 2011. Indeed, other Kentucky banks reported stability in their reserves and OREO accounts during the period when the Bank was finally taking catch-up write-downs and charges.

51.     Perhaps most telling, in the spring of 2011, the Bank offered to sell to SBAV a portion of its OREO portfolio at a significant discount to the value recorded in the Bank's books for those assets. Specifically, the Bank proposed that SBAV purchase for $7.5 million property the Bank had on its book at a value of $15 million. This offer was tantamount to an admission that the asset values on the Bank's books were inflated and did not reflect the price at which a "willing buyer and a willing seller" (i.e. fair market value) would transact.

52.     Worse, SBAV's own investigation into the value of the properties offered by the Bank confirmed that the Bank's valuation was absurdly high and that the Bank did not have in place sufficient processes and controls to accurately value its assets. An expert valuation firm engaged by SBAV to review the OREO properties determined the value of the properties to be well below even the heavily-discounted purchase price offered by the Bank. Moreover, SBAV's valuation firm noted a variety of deficiencies in the Bank's appraisal reports (to which, for the first time, SBAV was given access), including:

- Use of outdated sales data
- Lack of comparability in terms of size
- Too few comparable sales

22

- Lack of discussion of condition of subject property
- Lack of discussion of the comparable properties and use of an adjustment process that was unsupported by the analysis and description of the properties
- Market absorption estimates that were extremely optimistic and unsupported by marked data
- Operating expenses that were significantly too low

53.   On information and belief, many of the larger properties owned by the Bank were similarly mis-valued before SBAV purchased its shares in Porter Bancorp.

54.   In the wake of the Bank's dismal financial results and the imposition of more disciplined systems and processes required by the regulators, Porter and Bouvette were finally ousted as Chairman and as President/CEO, respectively.  After the independent management review mandated by the FDIC and KDIF, on or about March 29, 2012, Porter was named "Chairman Emeritus" of the Porter Bancorp, and replaced as Chairman and President and Chief Executive Officer of Porter Bancorp by Bouvette.  On or about July 19, 2012, Bouvette herself stepped down from her positions as President and Chief Executive Officer of PBI Bank and President of Porter Bancorp and was replaced in those positions by John T. Taylor.  Bouvette retained her position as Chairman and CEO of Porter Bancorp and Chairman of PBI Bank.

**G.   Defendants Made Numerous Material Misrepresentations And Omissions Of Fact**

55.   Defendants knew the appraisals which formed the basis for the Bank's valuation of its real estate assets and collateral were defective in that they did not provide adequate market and property data to support their valuation analysis and conclusions, did not contain sufficient descriptions of the subject properties or their relevant markets, did not list sufficient comparable sales data, did not consider the conditions of the subject or comparable properties, were conducted by relatives, and/or were not timely updated. Indeed, the Bank's own auditors warned it in early 2010 that many of its appraisals were outdated and needed refreshing.: .

23

Commission had sent a formal letter questioning Porter Bancorp's previously filed financial statements and disclosures.

57.     Porter Bancorp, Porter, and Bouvette knew at the time of the Offering that these representations were false and had no reasonable basis in fact, and that the financial statements they provided were materially misleading and their oral assurances of good health disingenuous at best.  Defendants further knew there was no reasonable basis for believing Porter Bancorp's SEC-filed financial statements as of July 23, 2010 were prepared in accordance with GAAP and complied in all material respects with applicable accounting requirements, including specifically, SFAS 114 with respect to the recognition of loan impairment losses and SFAS 5 with respect to loss reserves, and did not fairly present in all material respects the balance sheet of the Bank.

**FIRST CAUSE OF ACTION**
**(Violation of Kentucky Securities Act – KRS 292.480 – All Defendants)**

58.     SBAV repeats and realleges, as if set forth here in full, the allegations contained in paragraphs 1 through 57 hereof.

59.     The Kentucky Securities Act, KRS 292.480, provides that "[a]ny person, who offers or sells a security . . . by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made in the light of the circumstances under which they are made not misleading . . . is liable to the person buying the security from him."

60.     As set forth herein, each Defendant made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made not misleading, in connection with the offer or sale of Porter Bancorp's securities to SBAV.

25

61.     As set forth herein, Bouvette and Porter also directly or indirectly controlled Porter Bancorp at all relevant times.

62.     SBAV did not know that Defendants' statements were untrue or omitted to state material facts.

63.     SBAV purchased for $4,255,000 370,000 shares of Series B Preferred Stock at $11.50 per share, and a Warrant to purchase 185,000 shares of Non-Voting Common Stock at a purchase price of $11.50 per share.  On September 16, 2010, the Bank's shareholders approved the conversion of SBAV's Series B Preferred Stock into the same number of common shares.

64.     In addition, SBAV exercised its option and purchased for $745,016 64,784 shares of common stock and a Warrant to purchase 32,392 shares of Non-Voting Common Stock at a purchase price of $11.50 per share.

65.     By reason of Defendants' untrue statements and its omission of material facts, SBAV has been damaged in an amount to be determined at the trial of this action, but believed to be in excess of $4,500,000.

66.     In addition, SBAV is entitled to recover its costs and expenses, including interest and attorneys' fees and the costs of investigation, incurred in connection with this matter.

### SECOND CAUSE OF ACTION
(Negligent Misrepresentation — All Defendants)

67.     SBAV repeats and realleges, as if set forth here in full, the allegations contained in paragraphs 1 through 66 hereof.

68.     Defendants, in the course of their business, and in the context of the 2009 10-K, the 2010 First Quarter 10-K, and the Supplemental Private Placement, engaged in a series of transactions in which each of the Defendants have a pecuniary interest and supplied false

26

A/75308296

representations, warranties, covenants or agreements made by the Company in the Agreement or in the other Transaction Documents. SPA, § 4.8(a).

77.   Bouvette and the Company breached the Securities Purchase Agreement and the Letter Agreement (a) in that various of its representations and warranties were not true as of the date on which SBAV executed the Letter Agreement and the date of the closing thereunder, and (b) by failing to indemnify SBAV for its losses suffered as a result of the Company's breach of such representations and warranties, all as set forth hereinabove.

78.   By reason of the foregoing, SBAV has been damaged in an amount to be determined at the trial of this action, but believed to be in excess of $4,500,000.

79.   In addition, SBAV is entitled to recover its costs and expenses, including attorneys' fees and the costs of investigation, incurred in connection with this matter.

WHEREFORE, SBAV respectfully requests judgment as follows:

(a)   on the first cause of action, awarding to SBAV and against Defendants (i) recovery of the consideration paid for the securities, together with statutory interest from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the securities, upon the tender of the securities, or (ii) damages in the amount that would be recoverable upon a tender of the securities less the value of the securities when the buyer disposed of them, statutory interest from the date of disposition, costs, and reasonable attorneys' fees.

(b)   on each of the first and second causes of action, awarding to SBAV and against Defendants, jointly and severally, damages in an amount to be determined at the trial of this action, but believed to be in excess of $4,500,000, with interest thereon at the rate(s) prescribed by applicable law;

28

(c)     on the third cause of action, awarding to SBAV and against defendant Porter Bancorp and Bouvette damages in an amount to be determined at the trial of this action, but believed to be in excess of $4,500,000, with interest thereon at the rate(s) prescribed by applicable law;

(d)     on all causes of action, awarding to SBAV its costs and expenses, including interest, attorneys' fees and the costs of investigation, incurred herein, and granting such other and further relief as is just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims so triable.

Dated: New York, New York
December 17, 2012

**BINGHAM McCUTCHEN LLP**

By: s/ Beth I.Z. Boland
Todd B. Marcus
Colleen J. O'Loughlin
399 Park Avenue
New York, New York  10022-4689
(212) 705-7000


Beth I.Z. Boland
Bingham McCutchen LLP
One Federal Street
Boston, MA  02110
(617) 951-8000

29

A/75308296