UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------

SBAV LP,

Plaintiffs,

v.

PORTER BANCORP, INC., PBI BANK, INC.,
J. CHESTER PORTER,
and MARIA L. BOUVETTE,

Defendants.

---------------------------------------------------------------------

Docket No. 13 civ 0372 (PAE)

**ORAL ARGUMENT**
**REQUESTED**

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE AMENDED COMPLAINT OR, IN THE ALTERNATIVE,**
**TO TRANSFER THE CASE TO THE U.S. DISTRICT COURT FOR**
**THE WESTERN DISTRICT OF KENTUCKY, AT LOUISVILLE**

**BINGHAM MCCUTCHEN LLP**
**399 Park Avenue**
**New York, NY 10022-4689**
**(212) 705-7000**

# TABLE OF CONTENTS

Page

A.   Defendants are Subject to Personal Jurisdiction Under the New York State Long-Arm Statute ........................................................................ 8
    1.   Standard of Review ........................................................... 8
    2.   Porter Bancorp and PBI Bank Are Subject to Personal Jurisdiction Under the New York State Long-Arm Statute .......................... 9
    3.   Bouvette and Porter Are Subject to Personal Jurisdiction Under the New York State Long-Arm Statute .......................................... 11
B.   This Case is Not Subject to Transfer Under 28 U.S.C. ....................... 13
    1.   SBAV's Choice of Forum Is Entitled to Great Weight ............ 13
    2.   Defendants Have "Irrevocably Waived" Their Right to Contest the Alleged Inconvenience of a New York Forum ...................... 14
    3.   Defendants Here Fail to Meet the Criteria for Transfer ........... 15
        a.   New York Is More Convenient for the Non-Party Witnesses ............................................................. 16
        b.   New York Has a Compelling Interest in Hearing this Case ........ 19
C.   SBAV's Claims Are Not Subject to Dismissal under Fed R. Civ. P. 12(b)(6) ............................................................................... 20
    1.   Defendants Do Not Seek Dismissal of the Breach of Contract Claim .......................................................................... 20
    2.   SBAV's Misrepresentation Claims Are Well Pled ................. 21
        a.   Standard of Review ................................................. 21
        b.   The Allegations of the Amended Complaint State Misrepresentation Claims ......................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A.I.L, a Div. of Cutler-Hammer v. Symetrics Ind. Inc.,*
   360 F. Supp. 1138 (E.D.N.Y. 1973) ................................................10

*Am. Eagle Outfitters v. Tala Bros. Corp.,*
   457 F. Supp. 2d 747 (S.D.N.Y. 2006)...................................16, 17, 20

*Anadigics, Inc. v. Raytheon, Co.,*
   903 F. Supp. 615 (S.D.N.Y. 1995) ................................................20

*Asahi v. Metal Industry Co., Ltd. v. Sup. Ct. of Calif., Solano County,*
   480 U.S. 102 (1987)..........................................................10

*Ashland, Inc. v. Oppensheimer & Co., Inc.,*
   648 F.3d 461 (6th Cir. 2011) ..................................................20

*Ayers v. Arab. Am. Oil Co.,*
   571 F. Supp. 707 (S.D.N.Y. 1983) ................................................14

*Babbidge v. Apex Oil Co.,*
   676 F. Supp. 517 (S.D.N.Y. 1987) ................................................17

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)..........................................................21

*Boggess v. Commonwealth,*
   447 S.W.2d 88 (Ky. 1969).....................................................20

*Booth v. Verity, Inc.,*
   124 F. Supp. 2d 452 (W.D.Ky. 2000 ........................................19, 21

*Brewer v. Lincoln Int'l Group,*
   148 F. Supp. 2d 792 ..........................................................23

*Capitol Records, Inc. v. Kuang Dyi Co. of RM,*
   No. 03 Civ. 0520 (LAP), 2004 WL 405961 (S.D.N.Y. Mar. 4, 2004) ...................13

*Chloe v. Queen Bee of Beverly Hills, LLC,*
   616 F.3d 158 (2d Cir. 2010)....................................................8

*Citibank, N.A. v. Collins,*
   No. 90 Civ. 3330 (KMW), 1991 WL 64174 (S.D.N.Y. Apr. 15, 1991) ..................15

*Cleopatra Kohlique, Inc. v. New High Glass, Inc.*,
   652 F. Supp. 1254 (E.D.N.Y. 1987) ...................................................................8

*Courtroom Television Network v. Focus Media, Inc.*,
   695 N.Y.S.2d 17 (1st Dep't 1999) ....................................................................8

*Critikon, Inc.v. Becton Dickinson Vascular Access, Inc.*,
   821 F. Supp. 962 (D. Del. 1993) ......................................................................17

*Dehmlow v. Austin Fireworks*,
   963 F.2d 941 (7th Cir. 1992) ...........................................................................10

*Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*,
   7 N.Y.3d 65 (2006) .....................................................................................9, 11

*Dobina v. Weatherford Int'l Ltd.*,
   No. 11 Civ. 1646 (LAK), 2012 WL 5458148 (S.D.N.Y. Nov. 7, 2012) ...............25

*Editorial Musical Latino Americana v. Mar Int'l*,
   829 F. Supp. 62 (S.D.N.Y. 1993) ....................................................................13

*Elite Parfumes, Ltd. v. Riviera*,
   872 F. Supp. 1269 (S.D.N.Y. 1995)..................................................................15

*Frederick Goldman, Inc. v. Commemorative Brands, Inc.*,
   No. 04 Civ. 1100 (LTS), 2004 WL 954692 (S.D.N.Y. May 5, 2004)..................15

*Friedl v. City of New York*,
   210 F.3d 79 (2d Cir. 2000)..........................................................................22, 24

*Glass v. S&M Nutec, LLC*,
   456 F. Supp. 2d 498 (S.D.N.Y. 2006) ..............................................................17

*Harman v. Sullivan Univ. Sys., Inc.*,
   No. Civ.A. 03-738-C, 2005 WL 1353752 (W.D. Ky. June 6, 2005)....................23

*In re CINAR Corp. Sec. Litig.*,
   186 F. Supp. 2d 279 (E.D.N.Y. 2002) ..............................................................13

*In re NovaGold Res. Inc. Sec. Litig.*,
   629 F. Supp. 2d 272 (S.D.N.Y. 2009)...............................................................21

*In re Sumimoto Copper Litig.*,
   120 F. Supp. 2d 328 ........................................................................................13

*JPS Capital Partners, LLC v. Silo Point Holding LLC*,
   2009 N.Y. Slip Op. 51747(U), 2009 WL 2462252 (Sup. Ct. N.Y. Co. July 30, 2009)...........11

A/75467025

*Karl Koch Erecting Co., Inc. v. N.Y. Convention Ctr. Dev. Corp.*,
    838 F.2d 656 (2d Cir. 1988).................................................................................10

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988) ..................................................................................... *passim*

*Laufer v. Ostrow*,
    55 N.Y.2d 305 (1982) .................................................................................11, 12

*Leasing Svc. Corp. v. Graham*,
    646 F. Supp. 1410 (S.D.N.Y. 1986).................................................................15

*Mahtani v. C. Ramon, Inc.*,
    563 N.Y.S.2d 690 (1st Dep't 1990) .................................................................10

*Marine Midland Bank, N.A. v. Miller*,
    664 F.2d 899 (2d Cir. 1981).............................................................................12

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990).............................................................................25

*Metro Louisville/Jefferson Cnty. Gov't v. Abma*,
    326 S.W.3d 1 (Ky. App. 2009) ........................................................................21

*MK Sys., Inc. v. Schmidt*,
    No. 04 Civ. 8106 (RWS), 2005 WL 590665 (S.D.N.Y. March 10, 2005) ............15

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102 (2d Cir. 2010).............................................................................14

*Opticare Acquisition Corp. v. Castillo*,
    806 N.Y.S.2d 84 (2d Dep't 2005)......................................................................11

*Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*,
    6 F. Supp. 2d 203 (S.D.N.Y. 1998) .............................................................14, 15

*Orix Credit Alliance v. Mid-South Materials*,
    816 F. Supp. 230 (S.D.N.Y. 1993) ...................................................................15

*Parke-Bernet Galleries, Inc. v. Franklyn*,
    26 N.Y.2d 13 (1970) .........................................................................................9

*Pilates, Inc. v. Pilates Inst., Inc.*,
    891 F. Supp. 175 (S.D.N.Y. 1995) ..............................................................13, 20

*Presnell Const. Managers, Inc. v. EH Const., LLC*,
    134 S.W.3d 575 (Ky. 2004)..............................................................................22

A/75467025

*RadioShack Corp. v. ComSmart, Inc.*,
    222 S.W.3d 256 (Ky. App. 2007) ........................................................................25

*Republic Bank & Trust Co. v. Bear Stearns & Co.*,
    683 F.3d 239 (6th Cir. 2012) .....................................................................21, 23

*Rescuecom Corp. v. Google, Inc.*,
    562 F.3d 123 (2d Cir. 2009) ...........................................................................21

*Retail Software Svcs., Inc. v. Lashlee*,
    854 F.2d 18 (2d Cir. 1988) .............................................................................13

*San Shoe Trading Corp. v. Converse Inc.*,
    649 F. Supp. 341 (S.D.N.Y. 1986) .................................................................17

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) .......................................................................................22

*Sybron Corp. v. Wetzel*,
    46 N.Y.2d 197 (N.Y. 1978) ..............................................................................8

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) .......................................................................................23

*U.S. E.P.A. v. Gen. Elec. Co.*,
    197 F.3d 592 (2d Cir. 1999) ...........................................................................17

**STATUTES**

28 U.S.C. § 1404 ........................................................................................................3

28 U.S.C. § 1404(a) ...........................................................................................13, 15

N.Y. C.P.L.R. 301 ...................................................................................................12

N.Y. C.P.L.R. 302 ...................................................................................................12

N.Y. C.P.L.R. 302(a) ................................................................................................8

N.Y. C.P.L.R. 302(a)(1), (3) ....................................................................................8

Kentucky Securities Act, KRS 292.480 ..........................................................21, 22

15 U.S.C. § 78j(b) ...................................................................................................21

4

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(a) ...........................................................................................21

Fed. R. Civ. P. 9(b) ...........................................................................................21

Fed. R. Civ. P. 12(b)(2) ......................................................................................3

Fed. R. Civ. P. Rule 12(b)(6) .........................................................5, 20, 21, 25

In early 2010, PBI Bank, Inc. ("PBI") and its holding company parent, Porter Bancorp, Inc. ("Porter Bancorp," collectively, the "Bank") were anxious to inject new capital into the Bank. The founders and controlling shareholders of the Bank, Marie Bouvette and Chester Porter, were equally anxious to ensure Porter Bancorp's shares were priced high enough so they would not lose control of the Bank as they brought in new investors. They met with an investment banker in New York City, Sandler O'Neill + Partners, L.P. ("Sandler"), to price the deal and to find investors for a PIPE offering, which it did: two of the five investors in the Private Placement were from New York, and their investments totaled over $5 million of the original $27 million capital infusion. Another NYC-based investor, SBAV LP ("SBAV"), who had been introduced to the Bank via Sandler, invested another $5 million a few weeks later on the same terms as the original PIPE investors.

In order to entice SBAV to invest in the Bank, the Bank gave SBAV access to the same "virtual due diligence room" as the other investors, and *agreed to litigate in New York courts any dispute relating to the non-disclosure agreement covering that review.* Bouvette and Porter also personally met with representatives from SBAV, and the Bank exchanged nearly 200 calls and emails with SBAV at their offices in New York City. Bouvette, Porter and other Bank employees painted a picture of a stable bank which had aggressively moved to rid its book of problem loans in the wake of the financial crisis: they said problem loans had been classified appropriately, adequate reserves had been taken against their balances, the Bank had adequate financial and disclosure controls and sufficient expertise to evaluate its loan book, and Bank management was held in high esteem by the regulators. Bouvette in particular assured SBAV that its regulatory problems had been addressed, and repeatedly contacted SBAV to ensure it had received the information she had sent and to ensure the deal closed as soon as possible.

A/75467025

Almost immediately after SBAV invested $5 million in the Bank in July 2010, it became clear each of these representations was false, and the price of the Bank's shares plummeted; they now trade at less than $1.00.   The Bank has since exchanged hundreds of calls and correspondence with SBAV in New York about its financial problems, and proposed another deal with SBAV to help repair its balance sheet.   In that deal, the Bank again "*irrevocably submit[ted] to the personal jurisdiction of the state and federal courts*" in New York and "*irrevocably waive[ed] any objection to such forum on inconvenience or other grounds.*"

Defendants now seek to dismiss this suit for lack of jurisdiction (or in the alternative to transfer it to federal court in Kentucky), and for failure to state a claim.   Having intentionally and repeatedly accessed the capital markets in New York, having twice agreed with SBAV to submit to personal jurisdiction in New York, and having "irrevocably waived" any ability to assert that New York is an inconvenient forum, Defendants cannot claim they are somehow not subject to suit here.   Nor will Defendants be able to meet their "heavy burden" to overcome SBAV's choice of forum:   their contacts with SBAV in New York are multiple, substantial, and continuing; virtually all of the key witnesses other than those from the Bank (which has already agreed to litigate in New York) are located in New York and Philadelphia; and this Court—the recognized expert in the securities laws at issue here—has a compelling interest in policing securities sellers seeking capital from New York.   And Defendants' attempt to portray the value of their securities as pivoting on a detailed assessment of the value of certain Kentucky real estate is belied by their own choice of a New York investment banker with little experience in Kentucky real estate to evaluate and price their securities for sale.   It would be fundamentally unfair to force SBAV to abandon its choice of forum simply because the Bank wants to forum-shop for a different court to adjudicate this case.

2

## FACTS[1]

In order to kick off Porter Bancorp's capital raise, in early 2010 Chester Porter and Maria Bouvette met with Sandler, Porter Bancorp's New York-based investment banker from its initial public offering 2006. AC ¶ 19. Sandler then priced the securities, and found investors in New York for the Private Placement (the "Offering"). *Id.* ¶¶ 19, 21. A few days before the closing of the Private Placement, Thomas O'Neill, one of the name principals of Sandler, met with Scott Arnold of SBAV, in New York. AC ¶ 21, Arnold Aff. ¶ 3. At that meeting, O'Neill identified Porter Bancorp—*which SBAV had not contemplated as an investment, or even been aware of, prior to the meeting*—as a potential investment for SBAV, and offered to introduce SBAV to the Bank. Arnold Aff. ¶ 3. O'Neill then arranged for a meeting in New York between Mr. Arnold and Kirk Wycoff, a principal of the largest investor in the Private Placement and the designated investor representative to Porter Bancorp's board, to discuss Porter Bancorp. *Id.*, Exh. A.[2]

On June 30, 2010, Wycoff and Arnold and Hall met at SBAV's offices in New York, specifically to discuss SBAV's potential investment in Porter Bancorp. Arnold Aff. ¶ 4. Immediately after the meeting, Wycoff sent Arnold the press release touting Sandler's role in the

---

[1]   The facts herein are drawn where appropriate from the Amended Complaint ("AC"). Because Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(2) or to transfer under 28 U.S.C. § 1404, Plaintiff has submitted additional factual information via the accompanying affidavits of Beth I. Z. Boland ("Boland Aff.") and Scott Arnold ("Arnold Aff."). Abbreviated terms are the same as those utilized in the Amended Complaint and in Defendants' Motion to Dismiss the Amended Complaint or, in the Alternative, to Transfer the Case to the U.S. District Court for the Western District of Kentucky, at Louisville ("Mem.").

[2]   While Defendants assert that "Patriot did not decide to designate a director or a Board observer until after July 12, 2010," Mem. at 6, the document trail indicates at times he relayed information to and from the Bank long before such designation. Arnold Aff., Exhs. B-D.

Defendants further claim—*without submitting an affidavit from anyone with personal knowledge*—that "Sandler did not initiate SBAV's interest in" Porter Bancorp and that "[b]y happenstance, Wycoff . . . told SBAV about its investment in Bancorp" at a "social networking lunch." Mem. at 6, 15, 20. This characterization is directly contradicted by the one affiant who was actually at those meetings—Scott Arnold—and the paper trail before and after those meetings. *See* Arnold Aff. ¶¶ 3-4, Exhs. A-C.

A/75467025

Private Placement, and said "I will talk to maria [*sic*] [Bouvette] about adding $5mm to this total." *Id.,* Exh. B. The parties then prepared a confidentiality agreement in which Bouvette and Porter Bancorp agreed that ***"[a]ny disputes arising directly or indirectly under this agreement may be resolved before state or federal courts located in New York, New York and New York procedural and substantive law shall exclusively apply."*** *Id.*, Exh. D (emphasis added).

On July 9, Arnold spoke with Bouvette, during which conversation Arnold identified various due diligence items he wished to obtain; either during that call or shortly thereafter, they also discussed arranging a dinner meeting with Bouvette, Porter, and SBAV representatives early the following week. *Id.* ¶ 7. On July 12, Arnold again spoke with Bouvette and asked to arrange a site visit to the Bank; Bouvette agreed, and arranged for a team from SBAV to meet with various Bank personnel the following day. *Id.* ¶ 8.

On July 12, 2010, Wycoff, Bouvette and Porter personally met with Arnold, Hall, and other representatives from SBAV over dinner in Kentucky. AC ¶ 25; Arnold Aff. ¶ 9. At that meeting and in subsequent communications, Bouvette, Porter and other Bank employees painted a picture of a stable bank which had aggressively moved to rid its book of problem loans in the wake of the financial and real estate crisis. *Id.* They represented that problem loans had been classified appropriately, that adequate reserves had been taken against their balances, that the Bank had adequate financial and disclosure controls and sufficient expertise to evaluate its loan book, and that Bank management was held in high esteem by the regulators. *Id.* Bouvette stated explicitly that the Bank was thoroughly compliant with any conditions imposed upon it by its regulators, that the Bank had a very solid relationship with those regulators, and that the regulators had such confidence in management that they would look favorably upon the Bank's projected efforts to expand their presence in the region. *Id.*

Within hours after the site visit, Bouvette personally sent to Arnold the Private Placement deal documents.  *Id.*  ¶ 10, Exh. H.  Indeed, early the next morning Bouvette emailed Arnold asking "DID YOU GET THE DOCUMENTS??"  *Id.*  ¶ 12, Exh. J.  Later that same day, Bouvette forwarded to SBAV specific information about "the deal structure with respect to Preferred, common, etc." and "the 8K which spells it all out and a deal summary sheet that you might find helpful.  Call anytime if you need more info."  *Id.*  Exh. K.  Around the next day, Bouvette and Arnold spoke by telephone, during which Bouvette referenced the Bank's MOU with state and federal bank regulators; she assured Arnold, however, that the Bank was on track to meet all of the regulators' concerns and promised to send to Arnold a status report (the "MOU Status Report") showing the Bank's progress.  *Id.*  ¶ 13.[3]  The next morning, Bouvette sent Arnold the MOU Status Report, and again spoke by phone with him as well.  *Id.*  ¶ 14, Exhs. M-O.[4]  Based on, *inter alia,* the information provided by Bouvette, Porter, and the Bank, including in particular the information contained in the MOU Status Report and the Porter Bancorp's SEC filings, SBAV decided it would begin negotiations to invest in the Bank, and communicated its decision to the Bank early the next week. Arnold Aff. ¶ 16.  After negotiating the final deal terms as reflected in the Letter Agreement over the next few days, by July 23 the deal papers were ready for execution.  Between July 2 and July 23, Defendants and their representatives had

---

[3]  While Bouvette asserts she provided to SBAV the MOU at the July 13, 2010 site visit, SBAV has not yet located any record of having received that MOU.  Arnold Aff. ¶ 15.

[4]  Given the lengthy paper trail involving Bouvette from SBAV's files, her assertions under oath that "[m]y computer does not contain any e-mails to or from" SBAV and "I do not recall having any telephone calls" with SBAV prior to July 23, 2010, Bouvette Aff. ¶ 11, are highly suspect, as are many other statements made in her affidavit and that of Fred Price. **Appendix A** lists the factual statements made by Defendants that are either inadmissible in connection with a motion under Rule 12(b)(6), or are just plain wrong.  To the extent this Court is inclined to credit the Bouvette and Price Affidavits as they relate to issues of personal jurisdiction or transfer, or to the extent there is any question about whether relevant evidence has been erased from Bouvette's computer, SBAV renews its request to undertake immediate discovery of Defendants and Sandler in order to test the veracity of the affidavits on those issues.

A/75467025

exchanged nearly 200 emails and 5-10 telephone calls with SBAV in New York, including

approximately five telephone calls between Arnold/Hall and Bouvette.  Boland Aff. ¶ 2.

Unbeknownst to SBAV, however, on July 22, 2010 the SEC had sent by facsimile to the

Bank a comment letter forcefully questioning the Company's financial disclosures in its 2009

10-K and its Form 10-Q for the first quarter of 2010, upon which the deal had been based.  AC

¶ 39.   Rather than alerting SBAV to the SEC Comment Letter, the Bank instead worked

feverishly to ensure the deal closed before SBAV learned about it: starting at 5:45 p.m. on July

22, Bouvette sent Arnold an email with Subject "hoping we can close tomorrow" and stating:

> Any way we can get this done for us tomorrow.  All docs approved by your side.
> Would like to do press release tomorrow and want to talk about at conference.
> Any help would be appreciated.  I am traveling[5] and can't find your number or I
> would have called you.  Thanks for your help.

Arnold Aff. ¶ 17, Exh. P.  After several follow-up emails from Bouvette pressing SBAV to close

the deal, around 12:30 p.m. on the afternoon of July 23, 2010, SBAV executed the deal papers.

*Id*.  By 4:55 p.m. that same afternoon, the Bank issued a press release announcing SBAV's

investment, Arnold Aff. ¶ 18, Exh. Q, and then **touted that investment at an investors**

**conference in New York City sponsored by Keefe Bruyette & Woods the very next week.**

Boland Aff., Exh. A.   Even a year later, Bouvette was still touting SBAV's investment to

investors at the annual KBW conference in New York.  *Id.*, Exh. B.

Almost immediately after SBAV invested $5 million in the Bank in July 2010, it became

clear each of these material representations was false:

- Defendants  misrepresented the quality and effectiveness of the Bank's financial and
  disclosure controls in order to evaluate its loan book, including the use of independent
  appraisers (*e.g.*, AC ¶¶ 25, 27, 34(e), 43; Securities Purchase Agreement ("SPA")

---

[5]  It appears Bouvette was actually in New York when she sent the email to Arnold:  the "conference" to
which she was referring in the email was the annual KBW Community Bank Investor Conference at
which she was scheduled to speak the following week.  Boland Aff., Exh. A.

§ 3(u)).  These representations were later shown to be false in light of, *inter alia*, the SEC Comment Letter, the findings and conditions imposed on the Bank's systems and controls by its regulators, the fact that one of the Bank's appraisers was Porter's son, and the Bank's own admission that its internal processes for assessing loan grades was "not effective" (*e.g., AC ¶¶ 40, 43, 46-50, 52-53, 55, 60*);

- Defendants provided valuations for the Bank's assets which did not reflect their fair value, as evidenced by, *inter alia*, the SEC's questioning of the Bank's valuation of its assets, the fact that the Bank offered to sell SBAV some of its OREO at a fraction of its represented worth just a few months after the Private Placement closed, and the Bank's dramatic increases in losses and loss reserves immediately upon implementation of the internal systems and controls mandated by the regulators and by law (*e.g., id. ¶¶ 39-40, 56, 59, 64(a)*);

- Defendants misrepresented the propriety of the Bank's classification of its loans, its "aggressive" efforts to rid itself of problem loans, and the adequacy of reserves taken against loan and lease losses for non-performing assets (*e.g., id. ¶¶ 25, 27*).  These representations were shown to be false by, *inter alia*, the dramatic increase in the Bank's non-performing assets and OREO and correspondingly dramatic increase in its loan loss reserves (*e.g., id. ¶¶ 40, 47, 50, 52, 56, 58, 64(a), 64(b), 65*);

- Defendants misrepresented the Bank's compliance with the conditions imposed upon it by its regulators, and the esteem with which the regulators held its management (*e.g., id. ¶¶ 25, 39, 40, 47(a)*).  These representations were shown to be false by the SEC Comment Letter, the string of negative examination reports, consent orders, and agreements with regulators, and the ouster of Bouvette and Porter following the FDIC-mandated independent review of management (*e.g., id. ¶¶ 40, 46-48, 54, 62*).[6]

As this and other information came to light, the price of the Bank's shares plummeted; they now trade at less than $1.00.  AC ¶ 57.

After its investment, SBAV became one of the largest non-controlling shareholders of the Bank, and exchanged between 500-1000 calls, letters and emails with Bouvette and other Bank representatives about the Bank and its financial problems.  Boland Aff. ¶ 5.  Importantly, as part of subsequent negotiations with SBAV, in March 2011 ***Bouvette, on behalf of the Bank, again agreed to "irrevocably submit[] to the personal jurisdiction of the state and federal courts of the State of New York, County of New York, for any action concerning or relating to [the***

---

[6]  **Appendix B** contains a more detailed description of the factual representations made by Defendants and the evidence indicating such representations were false.

*confidentiality agreement], and irrevocably waive[] any objection to such forum on inconvenience or other grounds.*" Arnold Aff., Exh. R, § 7 (emphasis added).

## ANALYSIS

**A.    Defendants are Subject to Personal Jurisdiction Under the New York State Long-Arm Statute**

### 1.    Standard of Review

The New York long-arm statute conveys jurisdiction over any non-domiciliary "who in person or through an agent . . . transacts any business within the state" or "commits a tortious act without the state causing injury to person or property within the state." N.Y. C.P.L.R. 302(a)(1), (3).[7]  Under the statute, "[t]he key inquiry is whether defendant purposefully availed itself of the benefits" of the forum; a defendant need only have engaged in "some purposeful activity" within the state for which there is a "substantial relationship" between that activity and plaintiff's claims. *Courtroom Television Network v. Focus Media, Inc.*, 695 N.Y.S.2d 17, 19 (1st Dep't 1999).   "So long as a party avails itself of the benefits of the forum, has sufficient minimum contacts with it, and should reasonably expect to defend its actions there, due process is not offended if that party is subjected to jurisdiction even if not 'present' in that State." *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 466 (1988).   N.Y. C.P.L.R. 302(a) is a "single-act statute requiring but one transaction—albeit a purposeful transaction—to confer jurisdiction in New York." *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 17 (1970).   As such, "proof of

---

[7]  While some cases suggest that 302(a)(3) is directed to physical, and not economic, injury to property, other courts have held otherwise. *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 168 (2d Cir. 2010) (corporate executive who shipped counterfeit products into New York on behalf of his company deemed injured in New York); *Cleopatra Kohlique, Inc. v. New High Glass, Inc.*, 652 F. Supp. 1254, 1256 (E.D.N.Y. 1987) (misrepresentations made by defendant from its headquarters in Italy as to product specifications were relied upon and caused economic injury to plaintiff corporation in New York); *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 203-05 (N.Y. 1978) (jurisdiction proper over New Jersey defendant where potential revelation of trade secrets by defendant to new employer outside of New York would harm former employer in New York).

A/75467025

one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never

enters the state." *Kreutter*, 71 N.Y.2d at 467.[8]

### 2. Porter Bancorp and PBI Bank Are Subject to Personal Jurisdiction Under the New York State Long-Arm Statute

Here, this Court clearly has personal jurisdiction over the Bank, which availed itself of

the benefits of the forum through extensive contacts substantially related to SBAV's claims:

- It met with and engaged Sandler, the New York investment banker for its IPO, as its placement agent for the Private Placement.  Sandler identified a number of large New York-based investors for the Offering, and introduced SBAV to the Bank.  Prior to that introduction, SBAV had never previously contemplated an investment in, or even heard of, the Bank.[9]

- The Bank and its representatives exchanged nearly 200 emails and participated in a number of phone calls with SBAV and its representatives in New York.  In order to entice SBAV to invest, it provided SBAV with access (from New York) to the same "virtual due diligence room" as the other Offering investors, under a confidentiality agreement in which it explicitly agreed to personal jurisdiction in New York.[10]

- After its purchase, SBAV became one of the largest non-controlling shareholders in the Bank, and has since exchanged between 500-1,000 oral and written communications with it from its offices in New York.[11]  These communications

---

[8]  The "single purposeful act" can include communications by telephone or email made knowingly to customers located in New York: as early as 1970, courts have recognized that "in this day of instant long-rage communications, one can engage in extensive purposeful activity here without ever actually setting foot in the state." *Parke-Bernet Galleries*, 26 N.Y.2d at 17.  *See also Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006) (Kaye, C.J.) (New York recognizes long-arm jurisdiction "over commercial actors and investors using electronic and telephonic means to project themselves into New York to conduct business transactions.").

[9]  While Defendants now attempt to separate the Private Placement from SBAV's purchase, the Bank considered them to be part of the same offering.  After SBAV's meeting with Wycoff and Sandler, Wycoff noted he would "talk to [Bouvette] about adding $5mm" to the $27M Private Placement.  Bouvette then made clear to SBAV the shares would be offered on the same terms as the Private Placement, and asked that SBAV execute the same operative deal documents as the other investors.  Moreover, the entire $32 million in securities were all registered under the same Rule 506 exemption and Notice of Exempt Offering, which lists Sandler as the placement agent for the entire Offering.  Boland Aff., Exh. C.  And after SBAV's investment, the Bank referred to SBAV's purchase within the rubric of the Private Placement.  *See, e.g.,* Boland Aff., Exh. B.

[10]  It is irrelevant that Porter Bancorp's confidentiality agreement with the other investors may have provided for non-exclusive jurisdiction in Kentucky; the agreement with SBAV clearly did not.

[11]  While Defendants asserts that communications between SBAV and the Bank after the investment "are to be disregarded in the Court's jurisdictional analysis," Mem. at 7, in fact courts do consider such post-

9

included negotiations for SBAV to potentially purchase some of the Bank's troubled real estate assets, in which *the Bank executed another confidentiality agreement in which it agreed to "irrevocably submit to the personal jurisdiction of" and "irrevocably waive objection to" the New York courts on grounds of inconvenience.*

- At all relevant times, Defendants knew that any damages suffered by SBAV as a result of its tortious misrepresentations would occur in New York.

- Defendants made other trips to New York as part of its outreach to investors, including SBAV. In fact, Bouvette rushed to close the deal with SBAV in part so she could include it in her remarks at the annual KBW conference in New York the following week.[12]

The forum selection clauses executed by Bouvette on behalf of Porter Bancorp are virtually dispositive here. As a general rule, a forum selection clause will be enforced "unless it clearly can be shown that enforcement would be unreasonable and unjust." *Karl Koch Erecting Co., Inc. v. N.Y. Convention Ctr. Dev. Corp.*, 838 F.2d 656, 659 (2d Cir. 1988). Here, *Bouvette and Porter Bancorp explicitly and "irrevocably" consented to jurisdiction in New York in connection with SBAV's investment in the Bank not once, but twice.* Even the forum selection clause in the SPA supports this result. The SPA explicitly provides for "non-exclusive" jurisdiction in Kentucky; the parties thus specifically contemplated the Private Placement investors might sue Defendants in other fora as well. The SPA naturally would not list each of those other fora, which would depend on the location of each investor. As such, (1) the SPA

---

transactional contacts, especially when, they arise, as they do here, from the parties' continuing relationship in the forum. *See Asahi v. Metal Industry Co., Ltd. v. Sup. Ct. of Calif., Solano Cnty.*, 480 U.S. 102, 106 (1987) (ongoing contacts with forum state may be considered to determine whether defendant purposefully directed actions at the forum state); *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 n.6 (7th Cir. 1992) (same). The cases cited by Defendants, *A.I.L, a Div. of Cutler-Hammer v. Symetrics Ind. Inc.*, 360 F. Supp. 1138 (E.D.N.Y. 1973) and *Mahtani v. C. Ramon, Inc.*, 563 N.Y.S.2d 690 (1st Dep't 1990) are inapposite, as neither case involves continued and substantial contacts between the parties in dispute beyond the respective actions giving rise to the disputes under consideration therein.

[12]   While Bouvette asserts she and Porter regularly traveled to New York for banking industry conferences which "were not fund raising endeavors but merely professional, industry events," Bouvette Aff. ¶ 13, again that is not borne out by the documents. For example, Porter Bancorp's August 1, 2011 Form 8-K stated that Bouvette planned to "meet with investors" at the KBW conference and make a presentation in which she planned to showcase the $32 million Private Placement and the Bank's economic position within the market. Boland Aff., Exh. B.

A/75467025

clearly contemplates that Defendants could indeed be sued outside of Kentucky, and in whatever forum where each investor group was located; and (2) the Bank's concession of jurisdiction in New York *both before **and after** the SPA* reflects its acknowledgement that New York is in fact a proper forum in which to adjudicate disputes with SBAV involving the SPA.

Given (1) the location of SBAV and its principals in New York, (2) the Bank's reaping of benefits from multiple investors from New York, (3) the Bank's extensive and continuing contacts with SBAV and other Offering investors in New York, (4) SBAV's introduction to the Bank via the Bank's registered agent in New York, and (5) the Bank's agreement (at least two if not three times) to submit to personal jurisdiction in New York, the elements of due process and New York's long-arm statute are more than satisfied.  *See, e.g.*, *Deutsche Bank Sec., Inc.*, 7 N.Y.3d at 71 (jurisdiction proper over Montana seller of securities who agreed over email to the sale of bonds with a bank employee in New York ); *JPS Capital Partners, LLC v. Silo Point Holding LLC*, 2009 N.Y. Slip Op. 51747(U), 2009 WL 2462252, at *4-5 (Sup. Ct. N.Y. Co. July 30, 2009) (jurisdiction proper over Maryland defendants who used New York-based agent to solicit plaintiff by telephone to secure a mezzanine loan in connection with a real estate development in Maryland); *Opticare Acquisition Corp. v. Castillo*, 806 N.Y.S.2d 84, 90 (2d Dep't 2005) (execution of an employment agreement with a New York company by phone from outside state found sufficient).

### 3. Bouvette and Porter Are Subject to Personal Jurisdiction Under the New York State Long-Arm Statute

Defendants, relying on *Laufer v. Ostrow*, 55 N.Y.2d 305 (1982), argue that Bouvette and Porter are not subject to personal jurisdiction in New York because they were acting in their official, rather than their personal, capacities.  Mem. at 4.  *Laufer*, however, has since been rejected by New York's highest court.  In *Kreutter*, *supra*, the Court of Appeals concluded it was

11

"neither necessary nor desirable" to adopt the "fiduciary shield doctrine" upon which *Laufer* was predicated: the doctrine is not only unsupported by the statute's legislative history, but has been "soundly condemned . . . for unfairly prejudicing plaintiffs who seek relief against defendants conducting affairs in this State." 71 N.Y.2d at 470-71 (finding "no convincing reason why the mere fact of corporate employment should alter the jurisdictional calculus").[13]

Here, Bouvette and Porter acted not only as representatives of the Bank who were personally and actively involved in the Private Placement, but also as "control persons" of the Bank and as its controlling shareholders who signed the SEC filings at issue. AC ¶¶ 12, 13; Boland Aff., Exh. D. Bouvette admits she "was in charge of the day-to-day affairs of Bancorp and PBI" and was "in charge of this capital raising project for Bancorp." Bouvette Aff. ¶¶ 2, 4. Both she and Porter conceived the idea of the capital raise; met with Sandler (presumably in New York) and worked with them to effectuate the Private Placement; and personally wooed investors like SBAV to invest in the Bank.[14] As Chairman, CEO, and owners of 34.5% and 30.9% shares, respectively, they indisputably exercised overall control over the Bank as well: Porter Bancorp's own 2009 Form 10-K notes that Porter Bancorp is a "controlled company" under NASDAQ rules, and that Bouvette and Porter "have sufficient voting power . . . to control our company. In

---

[13] Even those courts recognizing the fiduciary shield doctrine have created exceptions which would nullify it here: for example, courts have refused to apply it where the corporate agent—like Bouvette and Porter here—stood to gain personally from the activities she/he conducted on behalf of the corporation. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 903 (2d Cir. 1981). *Laufer* is also distinguishable by the fact that it was decided under the "doing business" statute, N.Y. C.P.L.R. 301, rather than the "transacting business" statute, N.Y. C.P.L.R. 302.

[14] While Bouvette asserts her communications with SBAV "did not pertain to any negotiation with or representations to SBAV," Bouvette Aff. ¶ 11, the evidence shows otherwise. Bouvette in fact was the primary point of contact between SBAV and the Bank: she personally made a series of material misrepresentations and omissions to SBAV (about, *e.g.,* the MOU, the Bank's relationship with its regulators, and the Bank's efforts to rid itself of its nonperforming assets), told SBAV to "Call anytime if you need more info," and relayed proposed deal documents and due diligence materials during those discussions. Arnold Aff. ¶¶ 10-12, Exhs. H-K; AC ¶¶ 24, 25, 65.

A/75467025

exercising their voting power, they may act according to their own interests, which may be adverse to [other shareholders'] interests." Boland Aff. Exh. D, at 13-14.

Importantly, Porter and Bouvette did so for their own personal benefit: to price and sell the securities at a high enough price so they would retain their status as controlling shareholders of the Bank even after the additional capital was raised. As such, they served as "primary actor[s]" and the "driving force" behind the wrongful acts, and will be key witnesses who will need to travel to New York for trial anyway. *Kreutter*, 71 N.Y.2d at 470-71; *Pilates, Inc. v. Pilates Inst., Inc.*, 891 F. Supp. 175, 181 (S.D.N.Y. 1995). Indeed, their signature on relevant SEC filings alone subjects them to jurisdiction here. *In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 305-06 (E.D.N.Y. 2002). *See also Retail Software Svcs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir. 1988) (long-arm statute reaches employees who were "primary actors in" and economically benefitted from the transactions at issue); *Editorial Musical Latino Americana v. Mar Int'l*, 829 F. Supp. 62, 66 (S.D.N.Y. 1993) (corporate president with a financial interest in the company and the ability to supervise or control an infringing activity "will be held personally liable" under the state long-arm statute).[15]

## B.    This Case is Not Subject to Transfer Under 28 U.S.C. § 1404(a)

### 1.    SBAV's Choice of Forum Is Entitled to Great Weight

"The plaintiff's choice of forum is accorded *great weight* and must be deferred to unless the balance of conveniences *strongly favors* the defendant." *Capitol Records, Inc. v. Kuang Dyi Co. of RM*, No. 03 Civ. 0520 (LAP), 2004 WL 405961, at *3 (S.D.N.Y. Mar. 4, 2004) (Preska, C.J.) (emphasis added). In seeking transfer, the moving party "carries the burden of making out

---

[15]   Even aside from their own personal contacts with New York, jurisdiction over control persons like Porter and Bouvette can be imposed through the contacts of their agents, Porter Bancorp and PBI Bank. *In re Sumimoto Copper Litig.*, 120 F. Supp. 2d 328, 338 (S.D.N.Y. 2000); *Kreutter,* 71 N.Y.2d at 467 (agency relationship need not be formal).

A/75467025

a *strong case for transfer*," and must present "clear and convincing evidence" that the transfer is proper. *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (emphasis added); *see also Ayers v. Arab. Am. Oil Co.*, 571 F. Supp. 707, 709 (S.D.N.Y. 1983) ("Absent a clear and convincing showing that the balance of convenience strongly favors the alternate forum . . . discretionary transfers are not favored."). The burden on the defendant is particularly heavy where defendants' contacts with the forum are substantial: "the plaintiff's choice is generally accorded more deference where there is a material connection or significant contact between the forum state and the underlying events allegedly underlying the claim, . . . or where the plaintiff is a resident of the forum district." *Orb Factory, Ltd. v. Design Sci. Toys, Ltd.*, 6 F. Supp. 2d 203, 210 (S.D.N.Y. 1998)) (internal citations omitted).

### 2. Defendants Have "Irrevocably Waived" Their Right to Contest the Alleged Inconvenience of a New York Forum

As a threshold matter, Defendants have irrevocably waived their right to seek transfer on convenience grounds here. In the months after SBAV's investment in Porter Bancorp, the Bank still had not moved its non-performing assets off of its books, as it had represented had already been done prior to SBAV's investment. In the spring of 2011 SBAV sought to help the Bank in its efforts, and offered to purchase some of those assets (which, incidentally, the Bank had previously valued at $15 million and was now offering for $7.5 million). AC ¶ 59. As part of those negotiations, Porter Bancorp entered into a confidentiality agreement in which it not only agreed to personal jurisdiction in New York but also "*irrevocably waive[d] any objection to such forum on inconvenience or other grounds.*" Arnold Aff., Exh. R, § 7. Importantly, while Porter Bancorp agreed to jurisdiction in New York for "any action any action concerning or relating to this Agreement or its subject matter," *the Bank's "irrevocable waiver" of any objection to New York as an inconvenient forum is not limited.* As such, Porter Bancorp and its

14

agents cannot now seek to transfer this action elsewhere. *See Citibank, N.A. v. Collins*, No. 90 Civ. 3330 (KMW), 1991 WL 64174, at *3 (S.D.N.Y. Apr. 15, 1991) (denying motion to transfer where defendant waived right to contest forum on convenience grounds). Indeed, Porter Bancorp's explicit agreement—twice—to a permissive forum selection clause in New York "is determinative of the convenience to the parties." *Orix Credit Alliance v. Mid-South Materials*, 816 F. Supp. 230, 234 (S.D.N.Y. 1993); *see also MK Sys., Inc. v. Schmidt*, No. 04 Civ. 8106 (RWS), 2005 WL 590665, at *5 (S.D.N.Y. Mar. 10, 2005) (same); *Leasing Svc. Corp. v. Graham*, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986) (same).[16]

### 3.    Defendants Here Fail to Meet the Criteria for Transfer

Even if this Court were to conclude Defendants have not already waived their ability to seek transfer now, they do not meet the criteria for doing so. Defendants correctly note that courts considering a motion to transfer under 28 U.S.C. § 1404(a) evaluate a range of criteria. In addition to those factors identified by Defendants, the weight of the plaintiff's choice of forum is also considered significant to the analysis. *Orb Factory, Ltd.*, 6 F. Supp. 2d at 210; *Frederick Goldman, Inc. v. Commemorative Brands, Inc.*, No. 04 Civ. 1100 (LTS), 2004 WL 954692, at *1 (S.D.N.Y. May 5, 2004). Here, Defendants have failed to carry their heavy burden of making out a strong case for transfer by clear and convincing evidence: Defendants have reaped millions of dollars from selling securities in the Private Placement to investors in New York, and in fact

---

[16]   Defendants argue the case should be transferred because the parties agreed in the SPA to a *non-exclusive* forum selection and inconvenience clause in Kentucky. Mem. at 19. In addition to the fact that the Bank has made clear it indeed considers New York to be an appropriate forum for disputes between it and SBAV, courts have repeatedly held that a non-exclusive forum selection clause is not a material factor mandating transfer under § 1404(a). *Orix Credit Alliance*, 816 F. Supp. at 233 (non-exclusive forum selection clauses "should be given less weight under § 1404(a) than an agreement phrased in more compelling terms"). Even the case relied upon by Defendants, *Elite Parfumes, Ltd. v. Riviera*, 872 F. Supp. 1269 (S.D.N.Y. 1995), supports SBAV. There, the parties agreed to jurisdiction in New York despite its inconvenience to defendants: "even if the travelling were a serious inconvenience, it was contemplated by the parties when entering into the contract." *Id.*, at 1272.

have "irrevocably waived" any argument that New York is inconvenient; the key non-party witnesses are all located in New York, Philadelphia, or outside of Kentucky; the documents are all available in New York;[17] this Court has a clear interest in protecting defrauded investors in New York, and is the acknowledged authority on the relevant law; and the locus of operative events is in New York.  It would be fundamentally unfair to allow Defendants to retain a New York placement agent to find investors in New York, to woo those investors with misrepresentations made into the jurisdiction and to take their money, to immediately tout that investment to other investors at a banking conference in New York, and to *agree to litigate* disputes with those investors in New York, yet then cry "foul" when they are in fact sued by those investors in New York.  The law heavily weights plaintiff's choice of forum, and militates against transfer, for precisely these reasons.

###### a.    New York Is More Convenient for the Non-Party Witnesses

First, the locus of operative facts (*infra,* at 3-7*)* is in New York, and most of the key non-party witnesses are in fact within the subpoena power of only *this* Court, not Kentucky.  As per this Court's request, Defendants have outlined their projected witnesses in this matter.  These witnesses generally fall into the following four categories:   (1) current and former Bank employees and agents (loan officers and appraisers for the Questioned Properties, and participants in the due diligence discussions); (2) experts (real estate appraiser from Louisville); (3) regulators (FDIC-Chicago, Federal Reserve, SEC, KDFI); and (4) the Bank's auditors.

The convenience of these witnesses is not weighed equally.  The convenience of the Bank's employees and its expert witnesses "is entitled to little or no weight in deciding a transfer motion," given that the Bank has clearly subjected itself to—and affirmatively agreed to—

---

[17] "The location of documents and records is not a compelling consideration when records are easily portable." *Am. Eagle Outfitters v. Tala Bros. Corp.*, 457 F. Supp. 2d 747 (S.D.N.Y. 2006).

jurisdiction in New York and in so doing would anticipate that such witnesses would need to travel to New York anyway. *Babbidge v. Apex Oil Co.*, 676 F. Supp. 517, 520 (S.D.N.Y. 1987) (location of expert witnesses irrelevant); *Glass v. S&M Nutec, LLC*, 456 F. Supp. 2d 498, 503-04 (S.D.N.Y. 2006) (employee witnesses are available in any venue by virtue of the employment relationship).[18]  It is also extremely doubtful that the Bank could compel government regulators in Chicago (FDIC) or St. Louis (Federal Reserve) or Kentucky (KDFI) to serve as witnesses; SBAV would be just as likely to secure testimony from officials at the Securities and Exchange Commission in Washington D.C.  *U.S. E.P.A. v. Gen. Elec. Co.*, 197 F.3d 592, 597 (2d Cir. 1999) (Government employees "may not be subject to judicial proceedings unless there has been an express waiver of [sovereign] immunity.").  And, it is difficult to see how any testimony by the Bank's outside accountants would be decisive here:  not only would it consist of opinion testimony that would be more effectively rendered by experts, but SBAV has not sued the outside accountants for their role in this saga.

On the other hand, moving the case to Kentucky would pose great inconvenience to key witnesses whose testimony will undoubtedly be important and unavailable from other sources:

- Sandler, located in New York.  Sandler will be an important and unique source of information regarding, *inter alia,* the Bank's motivation for undertaking the Private Placement; the exact pricing of the securities offered, and the relationship between the pricing of the securities and its effect on Porter and Bouvette's majority control of the Bank's shares; the demand for the Bank's shares by potential investors; the representations made by the Bank during any investor "road shows" facilitated by Sandler; the timing of the Private Placement and possible diminution in the valuation of the Bank's securities if not sold on a timely basis; any issues or concerns raised in

---

[18]  Defendants also do not suggest that their former employees—if in fact *necessary* witnesses—would not be willing to testify without subpoena; in fact, courts presume that they will.  *Critikon, Inc.v. Becton Dickinson Vascular Access, Inc.*, 821 F. Supp. 962, 967 (D. Del. 1993).  Even if they don't appear voluntarily, they can testify via deposition.  *See San Shoe Trading Corp. v. Converse Inc.*, 649 F. Supp. 341, 347 (S.D.N.Y. 1986) (availability of defendant's witness via deposition deemed not  "sufficiently debilitating to defendant's case to overcome the burden it shoulders"); *Am. Eagle Outfitters*, 457 F. Supp. 2d at 478-79 (deposition testimony "a viable alternative" for out-of-state witnesses).

A/75467025

the course of Sandler's due diligence of the Bank; the connection between the initial Private Placement and SBAV's follow-on investment; and Porter/Bouvette's desire to maintain control of the Bank notwithstanding the capital raise.

- <u>Kirk Wycoff and his investment firm, Patriot Financial Partners, L.P. and Patriot Financial Partners Parallel, LP (collectively, "Patriot"), located in Philadelphia</u>. Wycoff/Patriot were the lead investors in the initial Private Placement; Wycoff was involved in many of the communications between SBAV and the Bank; and Wycoff now sits as Patriot's representative on the Board of Porter Bancorp. As such, Wycoff and Patriot will have a great deal of information regarding their pre-investment due diligence into the Bank and regarding the Bank's subsequent demise. Notably, Wycoff and Patriot are located within the subpoena range of this Court, but are not subject to subpoena in the Western District of Kentucky.

- <u>Representatives of SBAV</u>. At least five representatives of SBAV[19] had some substantive involvement in its investment in the Bank. Since that investment, an additional five representatives[20] had some substantive involvement in SBAV's communications with the Bank, its analysis of its investment in the Bank's financial difficulties, SBAV's efforts to purchase non-performing assets from the Bank, and/or the investigations of the Bank by regulators.

- <u>Experts</u>. SBAV anticipates calling experts on, *inter alia*, bank capitalization requirements, the appropriate recognition of loan impairment and asset classification by bank holding companies, as well as the Bank's compliance with GAAP procedures and the sufficiency of the Bank's systems and controls over loan reserves and the pricing of the Bank's loan portfolio.

While Defendants suggest that this case inextricably revolves around the fair value of Kentucky residential real estate and the status of the Kentucky residential real estate markets in 2010 and 2011, Mem. at 13-17,[21] it does not. SBAV did *not* buy real estate from the Bank; it did

---

[19] George Hall, Scott Arnold, John Galasso, Yvonne Chung, Vincent Darpino.

[20] Daniel Strauss, Ryan Murphy, Greg Taxin, Greg Roppa, Dave Shay.

[21] In so doing, Defendants mischaracterize SBAV's allegations. For example, Defendants claim that "SBAV contends that once the values of the OREO properties were properly reflected in the Bank's books, it resulted 'in a striking deterioration' of Bancorp's financial condition. [AC] ¶ 56." The Amended Complaint, however, says something far different: it alleges that "once the Bank *reformed its processes and procedures with respect to the valuation of its real estate assets and collateral, the proper classification of loans, and the appropriate reserves on account of properly classified assets*, it resulted in a striking deterioration of the Bank's financial condition, its capital reserves, and its stock price." AC ¶ 56. To the extent the Amended Complaint refers to individual properties, they are provided as "mere examples of pervasive problems that plagued the Bank's processes prior to SBAV investment . . . they paint a clear picture of a bank that had failed to develop, maintain, and document a comprehensive, systematic and consistently-applied process for its ALLL." AC ¶ 52.

18

not even buy loans *collateralized* by real estate. Rather, SBAV purchased the Bank's *securities* whose value depends on a wide variety of criteria, including the credit risk posed by its pool of borrowers, historical loan loss experience, specific problem loans, and the sufficiency of the bank's internal systems and controls. Porter Bancorp's own SEC filings are telling on this score: among the hundreds of pages of financial information filed by Porter Bancorp between 2010 and the present, in only the rare instance do those filings reference a single property owned or collateralized by the Bank. Indeed, ***the Bank itself chose a New York investment banker with little to no on-site experience with Kentucky real estate*** to price and sell its securities; if the value of the Porter Bancorp's securities were so closely dependent on the valuation of specific properties in Kentucky, it never would have done so.

### b. New York Has a Compelling Interest in Hearing this Case

Defendants also suggest that New York has little interest in this matter and little familiarity with the relevant law given that the Bank is located in Kentucky and that the state's substantive law applies. Mem. at 18. Not so. As the largest hub of investment capital in the country, if not the world, New York has an overriding interest in ensuring those capital markets are effectively policed and those investors are protected from misrepresentations. It comes as no surprise, then, that this court and the Second Circuit Court of Appeals are the acknowledged authorities on adjudicating misrepresentations under Section 12(a)(2) of the 1933 Act, upon which KRS 292.480 of the Kentucky Blue Sky Law is modeled. Indeed, there are so few cases decided under KRS 292.480 that the Kentucky courts regularly rely on federal securities decisions—*often rendered in this Circuit*—to provide them guidance as to how the Act should be interpreted. *Booth v. Verity, Inc.*, 124 F. Supp. 2d 452, 460, 464 (W.D. Ky. 2000) ("Kentucky courts have more experience and expertise in products liability and personal injury matters than in the securities arena. There are few reported Kentucky Blue Sky cases and Kentucky courts

A/75467025

have traditionally followed the federal lead in this area."); *Ashland, Inc. v. Oppensheimer & Co., Inc.*, 648 F.3d 461, 470-71 (6th Cir. 2011) (citing to cases from this District in analyzing 10b-5 claim to analyze Kentucky Blue Sky claim); *Boggess v. Commonwealth*, 447 S.W.2d 88, 92 (Ky. 1969) (same, citing to Second Circuit decision).

*   *   *

Accordingly, Defendants have failed to prove by *clear and convincing* evidence that the balance of conveniences "strongly favors" them and is sufficient to override the "great weight" afforded to SBAV's choice of forum.  *See, e.g., Am. Eagle Outfitters,* 457 F. Supp. 2d 474 (transfer denied where defendant shipped counterfeit sample products to plaintiff in New York and remainder of counterfeit material remained held in California); *Pilates,* 891 F. Supp. 175 (S.D.N.Y. 1995) (no transfer where defendant projected itself into New York to market and sell its services to customers in New York).[22]

### C.    SBAV's Claims Are Not Subject to Dismissal Under Fed. R. Civ. P. 12(b)(6)

#### 1.    Defendants Do Not Seek Dismissal of the Breach of Contract Claim

Defendants' argument that the Amended Complaint fails to state a claim against them also must fail.  First, Defendants do not even attempt to argue that SBAV's claim for breach of contract is insufficient.  SBAV alleges it was damaged by Porter Bancorp's multiple breaches of the representations and warranties made in the SPA and the Letter Agreement and that Porter Bancorp failed to indemnify SBAV from losses, costs, and expenses as it agreed to do. AC ¶¶ 33-35, 54, 64, 84-85.  Under Kentucky law, nothing more is required.  *See Metro Louisville/Jefferson Cnty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. App. 2009).

---

[22] Defendants cite to *Anadigics, Inc. v. Raytheon, Co.,* 903 F. Supp. 615 (S.D.N.Y. 1995), as being "on all fours" with the facts here. Mem. at 19. There, however, *the plaintiff itself agreed venue in New York was improper* despite having originally filed the case there; the only question was which jurisdiction the case should be transferred to.

## 2.   SBAV's Misrepresentation Claims Are Well Pled

Defendants' challenge of the sufficiency of SBAV's misrepresentation claims under Kentucky Blue Sky law and common law fares no better.   According to Defendants, the existence of a merger clause in the SPA gives Defendants license to make misrepresentations, no matter how untrue, without liability.   Not only do Defendants misapprehend the legal effect of the merger clause, but they impermissibly rely on affidavits to dispute SBAV's factual allegations (thereby raising questions of fact which cannot be resolved under Fed. R. Civ. P. 12(b)(6)), and attempt to pin responsibility on SBAV for Defendants' own misrepresentations that their financial and other disclosures were accurate and all was well.

### a.   Standard of Review

Fed. R. Civ. P. 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 283 (S.D.N.Y. 2009).[23]   In assessing a motion to dismiss, the Court must accept the Complaint's factual allegations as true and draw all inferences in Plaintiffs' favor. *See Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).   A complaint is sufficient as long as it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   The issue is "not whether a plaintiff will ultimately prevail but

---

[23] Defendants, citing *Republic Bank & Trust Co. v. Bear Stearns & Co.*, 683 F.3d 239 (6th Cir. 2012), incorrectly argue Fed. R. Civ. P. 9(b) governs misrepresentation claims under K.R.S. § 292.480. Mem. at 10.   The Kentucky Blue Sky claims in *Republic Bank,* however, included claims for *fraud* under K.R.S. § 292.320, which is modeled after   Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and requires proof of scienter.   There is no such requirement under K.R.S. § 292.480, which is modeled after Section 12(a)(2) of the Securities Act of 1933, 77 U.S.C. §l2(a)(2).   *See Booth*, 124 F. Supp. 2d at 463 (Rule 9(b) inapplicable to K.R.S. § 292.480).   In any event, Defendants do not contest that the pleading standard has been met as to the Bank defendants; they argue only that "[a]s to *Porter and Bouvette*, the Amended Complaint does not satisfy these pleading requirements." Mem. at 10 (emphasis added).   According to Defendants, the only alleged misrepresentations attributable to Porter and Bouvette individually are oral ones which cannot confer liability under the merger clause in the SPA. *Id.*   Because the merger clause is inapplicable to non-contractual claims, and because Defendants do not contest the legal sufficiency of SBAV's claim for breach of contract, this argument fails *ab initio.*

A/75467025

whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002).

While the Court may consider documents referenced in a complaint or incorporated by reference therein, "a district court errs when it consider[s] affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda, in ruling on a 12(b)(6) motion to dismiss." *Friedl v. City of New York,* 210 F.3d 79, 83-84 (2d Cir. 2000). Accordingly, any factual averments and exhibits to the Bouvette, Price and Tobias Affidavits which are not incorporated by reference in the Amended Complaint, may not be considered in resolving this motion and should be stricken from Defendants' submission. *See* **Appendix A**.

### b. The Allegations of the Amended Complaint State Misrepresentation Claims

The Kentucky Securities Act, KRS 292.480, provides that "[a]ny person, who offers or sells a security . . . by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made in light of the circumstances under which they are made not misleading . . . is liable to the person buying the security from him." The negligent misrepresentation claim requires that Defendants provided false information in a business transaction, on which SBAV justifiably relied, and Defendants failed to exercise reasonable care in providing information to SBAV. *See Presnell Const. Managers, Inc. v. EH Const., LLC,* 134 S.W.3d 575, 582-83 (Ky. 2004).

Here, the Amended Complaint alleges numerous affirmative misrepresentations of material fact in connection with its sale of the Bank's securities, as set forth in detail in **Appendix B**. Specifically, SBAV alleges that:

- Defendants misrepresented the quality and effectiveness of the Bank's financial and disclosure controls in order to evaluate its loan book, including the use of independent appraisers;

22

A/75467025

- Defendants provided valuations for the Bank's assets which did not reflect their fair value;

- Defendants misrepresented the Bank's "aggressive" efforts to rid its financials of problem loans in the wake of the financial and real estate crisis and the adequacy of reserves taken against loan and lease losses for non-performing assets;

- Defendants misrepresented the Bank's compliance with the conditions imposed upon it by its regulators, and the esteem in which the regulators held its management.

In response, Defendants assert SBAV had access to all material information (including about the MOU) it needed, and that SBAV did not conduct appropriate due diligence and did not reasonably rely on Defendants' representations. These defenses present classic issues of fact that cannot be resolved on a motion to dismiss. *See, e.g., TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (materiality "requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts and the significance of those inference to him, and these assessments are peculiarly ones for the trier of fact"); *Brewer v. Lincoln Int'l Group*, 148 F. Supp. 2d 792, 804 (W.D. Ky. 2000) (factual issue existed sufficient to deny motion to dismiss over whether the nondisclosure of particular appraisal by corporation's officers and directors was material); *Harman v. Sullivan Univ. Sys., Inc.*, No. Civ.A. 03-738-C, 2005 WL 1353752, at *5-6 (W.D. Ky. June 6, 2005) (reasonableness of plaintiff's reliance on defendant's allegedly false representations deemed material question of fact).[24]

Defendants rely heavily on *Republic Bank, supra*. There, the Sixth Circuit held that the explicit disclosures warning of the risks inherent in an investment in mortgage-backed securities in the offering documents were sufficient to overcome misrepresentation-by-omission allegations when those very risks came to pass. 683 F.3d at 262. Here, in contrast, SBAV does not allege

---

[24] The degree to which factual issues permeate the analysis is reinforced by the affidavits submitted by Defendants in support of their position. **Appendix A** identifies the portions of Defendants' factual submission which are inappropriately proffered by Defendants.

that the risks of investing in the Bank's securities were not disclosed, but that the Bank, Bouvette and Porter *actively misled* SBAV. *See infra*, at 7.

Defendants attempt to address this by characterizing the purported disclosure of the MOU[25] as sufficient to warn SBAV about the vulnerabilities leading to the collapse of its share price. Mem. at 8-9, 11. This is irrelevant. Even if SBAV were aware of the details of the MOU prior to its investment (which is unclear), and even if the MOU addressed each of the subjects of misrepresentation made by the Bank to SBAV (which it did not), Bouvette affirmatively represented to SBAV that the Bank was thoroughly compliant with regulatory requirements and was on track to meet all of the regulators' concerns; she also supplied Arnold with portions of a status report reflecting the Bank's view. AC ¶ 25; Arnold Aff. ¶ 14, Exhs. M-O.

Nor is it an answer, as Defendants suggest, that SBAV could have requested appraisal reports but did not do so. *See* Mem. at 9-10. Defendants cite no law holding that a purchaser of securities must think of every conceivable question to ensure it is not being misled by the seller's representations. SBAV relied on affirmative statements by Defendants – both oral and written – that the properties were appropriately valued by an independent appraiser on a quarterly basis. AC ¶¶ 25, 42. SBAV took Defendants at their word, never knowing that one of the so-called "independent appraisers" was none other than Porter's son, and that the Bank's systems and controls were so lax that the appraisals were *not* performed each quarter. *Id*. ¶ 43.

Finally, Defendants repeatedly contend that the merger clause in the SPA precludes SBAV from relying on oral representations for its claims against the Bank. Mem. at 10, 12 ("in accordance with the merger clause of the SPA, SBAV cannot rely on these alleged oral statements."). This position is completely unsupported. The merger clause only affects the

---

[25] The MOU—which is referred to but not attached to the SPA—is neither referenced nor incorporated in the Amended Complaint, and is not appropriately considered here. *See Friedl*, 210 F.3d at 83-84.

evidence available to support SBAV's claim for breach of contract, and not to its claims for negligent misrepresentation under common law or the Kentucky Securities Act. *RadioShack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 260-61 (Ky. App. 2007) (because misrepresentation claims sound in tort, rather than contract, parol evidence is admissible to show that the making of a contract was procured by fraudulent representations); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 581 (2d Cir. 1990) (oral representations actionable under Section 12(a)(2)). Such a rule would permit the seller of securities to make any false statement about the quality of the securities, the company issuing them or the underlying collateral with no consequence, so long as a merger clause was included in the purchase agreement. No policy underlying the Kentucky Securities Act or the common law supports such a conclusion. Defendants' argument must be disregarded in its entirety.

SBAV has amply pled that Defendants falsely represented that problem loans had been either sold or classified appropriately, that adequate reserves had been taken against their balances, that OREO had been valued appropriately by independent appraisers, that the Bank was fully compliant with the conditions imposed upon it by its regulators and its management held in high esteem by the regulators, and that the Bank had adequate financial and disclosure controls and sufficient expertise to evaluate its loan book. Defendants do not even contest the inadequacy of the Bank's internal controls; this alone is sufficient to maintain the Kentucky Securities Act and negligent misrepresentation claims. *See Dobina v. Weatherford Int'l Ltd.*, No. 11 Civ. 1646 (LAK), 2012 WL 5458148, at *7-9 (S.D.N.Y. Nov. 7, 2012). To the extent Defendants challenge SBAV's other allegations, they do so through the use of affidavits or factual assertions that cannot support dismissal under Rule 12(b)(6).

A/75467025

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated: New York, New York
      April 10, 2013

**BINGHAM McCUTCHEN LLP**

By: s/ Theo J. Robins
    Theo J. Robins
    399 Park Avenue
    New York, New York 10022-4689
    (212) 705-7000

    Beth I.Z. Boland (admitted *pro hac vice*)
    Jared A. Craft (admitted *pro hac vice*)
    BINGHAM McCUTCHEN LLP
    One Federal Street
    Boston, MA 02110
    (617) 951-8000

    *Attorneys for Plaintiff SBAV, LP*

A/75467025