UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:13-CV-710

**SBAV, LP**                                                                                                            **Plaintiff,**

v.

**PORTER BANCORP, INC.,
PBI BANK, INC.,
J. CHESTER PORTER, and
MARIA L. BOUVETTE**                                                **Defendants.**

### MEMORANDUM OPINION

This matter is before the Court upon the Joint Motion to Dismiss Plaintiff SBAV LP's Amended Complaint, submitted by Defendants Porter Bancorp, Inc. ("Bancorp"), PBI Bank, Inc. ("PBI" or "PBI Bank"), J. Chester Porter, and Maria L. Bouvette (collectively, "Defendants"). (Docket No. 92.) Plaintiff SBAV LP ("SBAV" or "the Company") has responded, (Docket No. 101), and Defendants have replied, (Docket No. 106). This matter is now ripe for adjudication. For the reasons set forth below, Defendants' motion will be GRANTED IN PART and DENIED IN PART.

### Factual Background

This claim involves SBAV, a limited partnership; Bancorp, a publicly-traded bank holding company; PBI Bank, Bancorp's wholly-owned subsidiary; Porter, chairman of the board of Bancorp and PBI; and Bouvette, president and chief executive officer of both companies.

Beginning in 2010, Bancorp endeavored to raise capital in compliance with federal and state requirements. (Docket No. 31 at ¶¶ 14, 18.) For the first wave of fundraising efforts, Bouvette and Porter reached out to Sandler O'Neil & Partners, LP ("Sandler"), a New York investment bank, to identify potential Bancorp investors. (Docket No. 31 at ¶ 19.) As a result of

Sandler's efforts, five investors acquired Bancorp securities as part of a private placement, which closed on June 30, 2010. (Docket No. 31 at ¶ 22.) The private placement yielded $27 million in proceeds. (Docket No. 92-1 at 3.) Neither SBAV nor its controlling investment advisor firm, the Clinton Group, Inc. ("Clinton") participated in this private placement. (Docket No. 92-1 at 3.)

Before the private placement closed, however, SBAV and Bancorp were introduced. (Docket No. 31 at ¶ 23.) Between July 1 and July 23, 2010, SBAV and Bancorp representatives considered a potential investment relationship. (Docket No. 31 at ¶ 24.) As SBAV conducted its due diligence, it engaged in a series of meetings, discussions, and correspondence with various PBI officials. Bancorp also allowed SBAV to access a "virtual due diligence room," also known as a "data room." (Docket No. 31 at ¶ 23.) The data room included financial information reflecting the status of accounts as of June 30, 2010. (Docket No. 31 at ¶ 23.) SBAV alleges that Bouvette, Porter, and others described a stable bank that actively targeted problem loans, had adequate reserves against its balances, and enjoyed regulatory approval. (Docket No. 31 at ¶ 25.) SBAV argues that these representations echoed PBI's SEC filings, including its Annual Report for the Fiscal Year Ended December 31, 2009 ("2009 Form 10-K") and Quarterly Report For the Period Ended March 31, 2020 ("IQ 2010 Form 10-Q"). These were the most recent filings at the time of SBAV's investment. (Docket No. 31 at ¶ 26-27.)

On July 13, 2010, SBAV's investment manager met with Bouvette, Porter, and other Bancorp executives. Ten days later, SBAV entered into a Letter Agreement with Bancorp, agreeing to invest $5 million on the same terms as the initial investments. (Docket No. 31 at ¶ 28.) The Letter Agreement incorporated the terms of several agreements that had been part of the private placement, including a Securities Purchase Agreement ("SPA"), the Voting and Support Agreement, and the Registration Rights Agreement. (Docket No. 31 at ¶ 28.) Defendants

contend that the Letter agreement contained schedules incorporating the private placement documents, including a provision explaining that Bancorp had entered into a Memorandum of Understanding with the Federal Deposit Insurance Corporation ("FDIC") and the Kentucky Department of Financial Institutions ("KDFI") as of April 20, 2010. (*See* Docket No. 92-2 at 61.)

On July 22, 2010, one day before SBAV's investment closed, Bancorp received a comment letter from the Securities and Exchange Commission ("SEC") requesting that the company provide various data. (Docket No. 31 at ¶ 39.) SBAV received a copy of the SEC Comment Letter from Defendants on July 30 2010. (Docket No. 31 at ¶ 41.) SBAV contends that Defendants actively sought to close the deal before SBAV could discover the SEC comment letter. (Docket No. 31 at ¶ 41.) Almost three months later, SBAV made a second investment on September 27, 2010, after receiving the SEC Comment Letter and Bancorp's second quarter financials. (Docket No. 31 at ¶ 30.)

PBI's regulatory troubles intensified after the SBAV deal was finalized. The FDIC and the KDFI issued a Joint Examination Report of PBI on January 3, 2011 (the "Joint Report"). As a result of the Joint Report, the two agencies issued a Notice of Charges and of Hearing describing the unsound banking practices and regulatory violations alleged to have been committed by the Bank. (Docket No. 31 at ¶ 44-45.) The agencies entered the Consent Order against the Bank on June 24, 2011, requiring a management review and mandating that PBI reform its internal and financial controls in order to correct all violations of law. (Docket No. 31 at ¶¶ 47-62.) PBI also confronted regulatory scrutiny from the Federal Reserve Bank, which imposed a binding agreement on Porter Bancorp and limited its ability to issue dividends or raise capital without approval. (Docket No. 31 at ¶¶ 44, 48.)

Simultaneously, the parties considered a deal wherein SBAV would purchase a portion of PBI's Other Real Estate Owned ("OREO") properties.[1] (Docket No. 31 at ¶ 59.) In the course of negotiations, Clinton and SBAV conducted property valuations. (Docket No. 31 at ¶ 60.) SBAV's valuation contractors expressed that certain properties were valued lower than was reflected in the previous assessment. (Docket No. 31 at ¶ 60.) Given the purportedly excessive price and alleged deficiencies in PBI's appraisal process, the proposed OREO sale ultimately failed. (Docket No. 31 at ¶ 43, 52-54.)

Although PBI began to implement the mandated reforms, its financial losses increased throughout 2011— an amount totaling over $100 million since the initial investment, according to SBAV. (Docket No. 101 at 13.) Its share price plunged from $11.50 per share in July 2010 to less than $1.00 at the time SBAV filed the instant action. (Docket No. 101 at 13.)

SBAV now contends that the financial conditions of Bancorp and PBI were not accurately communicated before it purchased the stock. Specifically, SBAV contends that Defendants misrepresented the adequacy of PBI's financial and disclosure controls; mischaracterized the problem loans within its portfolio and maintained inadequate reserves against losses for non-performing loans; misrepresented the value of the loans and other assets on its books; and misrepresented the degree to which regulators maintained confidence in its financial soundness. (Docket No. 101 at 7.) SBAV argues that many of its concerns were shared by government

---

[1] SBAV's response brief to the instant motion offers a useful explanation of OREO assets:

> OREO are low-quality assets generally acquired through foreclosure or deeds in lieu of foreclosure after a borrower defaults on a loan. While price risk is the primary risk presented by OREO, liquidity, operational, compliance, and reputational risks may also be present. A bank's purchase of property through foreclosure usually indicates a lack of demand for the property, and a bank often suffers a loss when disposing of OREO despite the apparent adequacy of appraised values. OREO is often a non-earning asset, and the bank incurs costs to hold the property such as property taxes, insurance, utilities, repairs, and maintenance.

(Docket No. 101 at 11.)

regulators, who identified such red flags both before and after SBAV's investment. (Docket No. 101 at 7.) According to SBAV, Defendants' misrepresentations caused SBAV to ultimately lose its entire $5 million investment. Its Amended Complaint alleges negligent misrepresentation, breach of contract, and violation of Kentucky securities laws in connection with Bancorp's 2010 raise of capital from SBAV. (Docket No. 31.) It seeks to recover damages exceeding $4,500,000.00 in the instant action. (Docket No. 101 at 13.)

Defendants argue that SBAV's claims are grounded entirely on post-purchase events, including the stock's performance over a year after SBAV's purchase. They claim that SBAV's allegations rely upon generalized puffery that cannot serve as the basis of a lawsuit and that the Amended Complaint insufficiently pleads that Defendants knowingly misrepresented the companies' financial conditions. (Docket No. 92.)

**Legal Standard**

As an initial matter, the Court must determine which pleading standard to apply to SBAV's claims alleging violation of Ky. Rev. Stat. § 292.480 and of negligent misrepresentation. Sixth Circuit precedent dictates the outcome. In *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 247-48 (6th Cir. 2012), the Court of Appeals confirmed that, like fraud, allegations of negligent misrepresentation and violation of Ky. Rev. Stat. § 292.480 must be pled with particularity. *Id*. at 247 (citing *Thomas v. Schneider,* 2010 WL 3447662, at *1 n.2 (Ky. Ct. App. Sept. 3, 2010).

Essential to an allegation of negligent misrepresentation under Kentucky law is the plaintiff's assertion that the defendant "'supplie[d] false information for the guidance of others in [a] business transaction.'" *Id*. (quoting *Presnell Constr. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580 (Ky. 2004)). Because this element "requires an allegation of duplicity," *id*., it

5

implicates the purpose of Rule 9(b); that is, "'to alert defendants as to the particulars of their alleged misconduct so that they may respond. . . . [T]o prevent fishing expeditions, to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters.'" *Id*. (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (internal quotation marks and citations omitted). In light of this goal, the Court of Appeals held that Rule 9(b) applies to negligent misrepresentation and Blue Sky Law claims.

The same analysis governs here, as SBAV's Amended Complaint sounds in fraud. Although SBAV does not place the label of "fraud" on its claims, they are nonetheless "premised on allegations of fraud." *Republic Bank*, 683 F.3d at 256, n.7 ("[C]ourts may make a preliminary inquiry into the nature of the plaintiff's allegations . . . [to determine whether] the claims are premised on allegations of fraud. . . . If the underlying claims sound in fraud, Rule 9(b) applies." (internal quotations and citations omitted)). Throughout its Amended Complaint, SBAV alleges that Defendants knowingly offered false and misleading information in connection with SBAV's investment. (See, e.g., Docket No. 31 at ¶¶ 49, 65.) Accordingly, its claims are grounded in fraud and must satisfy Rule 9(b)'s heightened pleading requirements.

Although Rule 9(b) requires SBAV to plead its claims with particularity, "[a] complaint should not be dismissed 'unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Michaels Bld. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The Court will construe Rule 9(b)'s particularity requirement in tandem with Rule 8's emphasis on "simplicity and flexibility." *Id.* (quoting 5 Wright & Miller, Federal Practice and Procedure: Civil § 1298, at 407 (1969)). "[T]he purpose undergirding the particularity requirement of Rule 9(b) is to provide a defendant fair notice of the substance of a plaintiff's claim in order that the

6

defendant may prepare a responsive pleading." *Id.* (citations omitted). It is against this standard that the Court reviews the facts.

## Analysis

**I. SBAV's claims against PBI Bank must be dismissed.**

SBAV's Amended Complaint fails to allege any actionable misstatement or omission by PBI Bank. Rule 9(b) requires that when a complaint involves multiple defendants, "each defendant's rule must be particularized with respect to their alleged involvement in the fraud." *GMAC Mortgage, LLC v. McKeever*, 2010 WL 3470312, at *2 (E.D. Ky. Aug. 31, 2010) (citing *Coffey v. Foamex, L.P.*, 2 F.3d 157, 161-62 (6th Cir. 1993); *Anderson v. Pine South Cap., LLC*, 177 F. Supp. 2d 591, 596-97 (W.D. Ky. 2001)). Here, SBAV has not particularized each defendants' role in the alleged misrepresentation. *See James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC*, 941 F. Supp. 807, 822 (E.D. Ky. 2013) (holding that vague reference to identity of defendants that made each of the specific representations did not satisfy the heightened pleading standard).

Despite SBAV's claims that PBI Bank and Bancorp are effectively one party, they are nonetheless separate legal entities. Kentucky courts are reluctant to disregard corporate entity status and generally do so only under extraordinary circumstances. *See Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983). SBAV has pled no basis justifying the extraordinary action of disregarding the companies' corporate structure. *See Sudamax Indsturia e Comercio de Cigarros, Ltda. v. Buttes & Ashes, Inc.*, 516 F. Supp. 2d 841, 847 (W.D. Ky. 2007).

SBAV did not make a direct investment in PBI Bank, nor was PBI Bank a party or signatory to any document governing SBAV's purchase of Bancorp's securities. Moreover, SBAV has not alleged that PBI Bank was an "offeror" or "seller" with respect to Bancorp's securities,

as required for liability under Ky. Rev. Stat. 292.480(1). SBAV has not indicated that PBI Bank played any part in selling the securities at issue. Although SBAV argues that PBI Bank is a "seller" of Bancorp's securities as a member of the "selling group," (Docket No. 101 at 28-31), the Court finds no legal authority supporting this theory.

To the contrary, the United States Supreme Court has explained who may be liable under analogous federal law, noting that persons are not exposed to liability solely through their "mere participation in unlawful sales transactions." *Pinter v. Dahl*, 486 U.S. 622, 650 (1988). The Court continued:

> There is no support in the statutory language or legislative history for expansion of. . . primary liability beyond persons who pass title and persons who "offer," including those who "solicit" offers. Indeed, § 12's failure to impose express liability for mere participation in unlawful sales transactions suggests that Congress did not intend that the section impose liability on participants collateral to the offer or sale.

*Id.* Because this Court may look to federal law for guidance as Kentucky's Blue Sky statute parallels federal securities law, *Booth v. Verity, Inc.*, 124 F. Supp. 2d 452, 459 (W.D. Ky. 2000) (citations omitted), the *Pinter* analysis controls. Because SBAV has alleged no particularized facts demonstrating PBI Bank's active participation, its claims must be dismissed.

For these reasons, the Court agrees with Defendants that PBI Bank should be dismissed from the instant case, there being no evidence indicating its direct involvement in the sale. The Court will next consider SBAV's claims as to the remaining parties.[2]

---

[2] SBAV further argues that Defendants waived their arguments to dismiss PBI as an improper party under Rule 12(g) because they failed to assert such claims in their previous motions to dismiss. For the reasons delineated in Section III, *infra*, the Court declines to accept this argument.

**II.     SBAV's Blue Sky Law claim is sufficient to survive a motion to dismiss.**

Ky. Rev. Stat. 292.480 requires proof of three elements: "(1) offer or sale of a security, (2) by means of an untrue statement or omission concerning a material fact; (3) that the seller knew or should have known was untrue or misleading." *Republic Bank*, 683 F.3d at 262. Defendants argue that this claim must fail, as SBAV has failed to allege any actionable misstatements or omissions. (Docket No. 92-1 at 6.)

SBAV alleges numerous fraudulent acts that occurred over an extended period of time. Therefore, the Court will apply Rule 9(b)'s specificity requirements less stringently. *Whalen v. Stryker Corp.*, 783 F. Supp. 2d 977, 982 (E.D. Ky. 2011) (citing *U.S. ex. rel. Bledsoe v. Comm. Health Sys., Inc.*, 501 F.3d 493, 509-10 (6th Cir. 2007)). Applying this principle, the Court finds that SBAV's Complaint largely satisfies the notice requirement. The Amended Complaint and the accompanying factual allegations "specif[y] the parties and participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the fraudulent scheme, the fraudulent intent of the defendants . . . and the injury resulting from the fraud." *Id.* Specifically, SBAV alleges that Defendants misrepresented the efficacy of the Bank's financial and disclosure controls; misclassified the troubled loans in the Bank's portfolio and maintained insufficient reserved against losses for non-performing loans; misrepresented the value of the assets on the Bank's books, included foreclosed-upon real estate; and misrepresented regulatory confidence in its financial security. (*See* Docket No. 101 at 11.) To be sure, SBAV's telling of the facts leaves some questions unanswered. However, Rule 9(b) was not designed to exact a recital of the evidence, but instead "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 679 (6th Cir. 1988).

### a.     Internal controls

Throughout various documents, Defendants made statements regarding the effectiveness of the Bank's internal controls. The SPA represented that Porter Bancorp's internal control over financial reporting was "effective." (Docket No. 92-2.) This characterization was echoed in the Bank's 2009 Form 10-K, which attested that the Bank's financial and disclosure controls and procedures were "effective" as of December 31, 2009. (Docket No. 102-8.) The Bank's SEC filings noted that independent appraisal and quarterly evaluations made its valuation of OREO particularly sound. (Docket No. 102-8 at 72.)

Such assurances lie in stark contrast to those of the Bank's 2011 Form 10-K. In this form, management admitted that the Bank's internal controls for loan valuation

> did not always establish an accurate grade for credit risk. . . . In preparing our annual report on Form 10-K, we identified the extent to which our loan review controls did not operate and expanded the scope to cover the remainder of the portfolio and adjusted our allowances for loan losses . . . . Based on its assessment, Management believes that as of December 31, 2011, the Company's internal control was not effective in achieving the objectives stated above.

(Docket No. 102-7 at 13.) Although Defendants argue that this admission applies only to shortfalls in 2011 and does not reach prior years, there is no indication that the 2011 controls were less rigorous than those that existed in 2009 and 2010. However, given the regulatory scrutiny the Bank confronted and Defendants' admission that internal controls were ineffective as of December 31, 2011, one may reasonably infer, at least at the pleading stage, that the Bank's internal controls were inadequate throughout the relevant period. *See Dobina v. Weatherford Intern. Ltd.*, 909 F. Supp. 2d. 228, 245 (S.D.N.Y. 2012).

**b.      Misclassification of problem loans**

SBAV further alleges that the Bank improperly portrayed the reserves it took against loan and lease losses for non-performing loans before SBAV's investment. Defendants represented that the Bank's non-performing assets were shrinking, its problem loans were stabilizing, and that its management had "concluded that the loan loss reserves of PBI Bank [were] adequate." (Docket No. 92-2.) However, the SEC's Comment Letter later questioned the Bank's disclosures, requiring it to explain key features of its loan classification system. (Docket No. 102-10.) The FDIC and the KDFI later ordered the Bank to alter its loan classification system to "strengthen the Bank's loan review function and ensure the timely and accurate grading of the Bank's credit relationships." (Docket No 102-1 at §§ 4(a), 5.) When the Bank corrected these errors, its financial outlook dramatically dimmed.

Such misclassifications and the resulting over reporting of loan values may constitute a material misrepresentation of fact. SBAV does not merely allege that loans were overvalued, but also that Defendants "made affirmative misrepresentations inconsistent with the state of corporate affairs they knew to exist." *In re Sirrom Capital Corp. Secs. Litig.*, 84 F. Supp. 2d. 933, 941 (E.D. Tenn. 1999) (quoting *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992)). If these statements are proven false, as SBAV alleges, they are actionable. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 925-26 (9th Cir. 1993) (holding that "the deliberate failure to recognize problem loans, thus understating the reserve, constitutes an actionable omission or misrepresentation of existing fact which cannot be dismissed as a mere matter of internal mismanagement, unsound business practice, or poor accounting judgment.").

**c.     Improper valuations and regulatory concerns**

SBAV also argues that Defendants materially represented the value of the Bank's loan portfolio and its OREO. In its 2010 Form 10-Q, the Bank valued its OREO assets at $59.7 million and expenses at $378,000, as of March 31, 2010. (Docket No. 102-8.) SBAV also points to Bouvette and Porter's expressions of confidence in these valuations at the July 13, 2010 dinner meeting, affirming that the OREO properties were valued at prices that reflected fair value. (Docket No. 31 at ¶ 25.) Later, in Spring 2011, the Bank offered to sell OREO at half the price indicated on the Bank's books as of July 2010.

The Bank's shift in treatment of its OREO holdings creates plausible issues of fact as to whether its valuation of OREO was deficient. *See Sirrom Capital Corp.*, 84 F. Supp. 2d at 941 (finding false representations of the value of a bank's loan portfolio were actionable under securities laws). However, to the extent that SBAV relies solely on Defendants' broad expressions of confidence in the Bank's health, such statements cannot serve as the basis for a claim. Kentucky law dictates that neither "puffing" nor "sales talk" comprises an actionable misrepresentation. *McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky. 1955). Although an expression of opinion is actionable where the "declarant falsely represents his opinion of a future happening," *Edward Brockhaus & Co. v. Gilson*, 92 S.W.2d 830, 834 (Ky. 1936), or "when a deliberately false opinion is expressed," *id*. at 835, "an expression of an opinion as to future profits is not actionable as fraud under Kentucky law, at least where the subject of the opinion is not susceptible of definite knowledge." *Radioshack Corp.v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. App. 2007). In light of this standard, Defendants' broad representations as to the Bank's reputation and integrity—including general expressions of confidence in its risk management and likelihood of success made during the July 13, 2010 dinner meeting—in and of themselves would

not support a claim for a violation of Kentucky's Blue Sky Laws. However, sufficient allegations otherwise support this claim.

### d. Defendants' state of mind

Defendants further argue that SBAV has made no showing that Defendants acted with the requisite state of mind with respect to any purported misstatements or omissions. (Docket No. 92-1 at 6.) SBAV has generally alleged Defendant's knowledge that the representations in question were false at the time they were made. *See* Fed. R. Civ. P. 9(b); *see also* Docket No. 31 at ¶ 65 ("Porter Bancorp, Porter, and Bouvette knew at the time of the Offering that these representations were false and had no reasonable basis in fact, and that the financial statements they provided were materially misleading and their oral assurances of good health disingenuous at best."). However, as discussed above, SBAV must satisfy the heightened pleadings standards of Rule 9(b) and the Private Securities Litigation Reform Act. *See Republic Bank*, 683 F.3d at 262 (dismissing plaintiff's claims based on alleged misrepresentations and omissions that were not pleaded with particularity sufficient to satisfy these provisions).

Under these standards, SBAV must "state with particularity facts giving use to a strong inference that the defendant[s] acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007) (quoting 15 U.S.C. § 78u-4(b)(2)). In analyzing whether SBAV has satisfied this standard, the Court considers "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* Liability requires proof of Defendants' "scienter"—that is, proof that they either knew their statements were false or that they were reckless in disregarding a substantial risk that they were false. *See In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548-49 (6th Cir. 1999). "The inference that the defendant acted with scienter

13

need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 424 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004)). Simply put, the Court queries whether, "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

The Court finds that SBAV's allegations have created the "strong inference" of scienter necessary to survive Defendants' motion to dismiss. Defendants allege that SBAV's argument is rooted not in the SPA or Bancorp's SEC filings, but in government investigations, declining financial outcomes, and changes to corporate policy, all of which occurred after SBAV's investment. Such information, they contend, cannot indicate the falsity of statements made prior to SBAV's investment. (Docket No. 106 at 10.) The Court disagrees. Although these events occurred after SBAV's investment, they may nonetheless reflect a misrepresentation at the time of purchase. As SBAV emphasizes, "In the absence of a flat-out admission by Defendants that these statements were false, the *only* way to prove their falsity is by pointing to events occurring after SBAV's purchase." (Docket No. 101 at 24.) Given these events, the Court finds that the inference of scienter is at least as likely as its opposite. Accordingly, SBAV's complaint satisfies the motion to dismiss.

## II. SBAV has adequately pled a claim for negligent misrepresentation.

Count II of SBAV's Amended Complaint alleges negligent misrepresentation. In accordance with the Restatement (Second) of Torts § 552(1), Kentucky holds liable for pecuniary loss a person who, "(1) in the course of his business or in a transaction in which he has a pecuniary interest, (2) supplies false information for the guidance of others in their business transactions, if (3) he fails to exercise reasonable care or competence in obtaining or communicating the

information and (4) the plaintiff justifiably relied on the information." *Republic Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, 707 F. Supp. 2d. 702, 713 (W.D. Ky. 2010). As discussed above, such claims are subject to Rule 9(b)'s heightened pleading standard. *Republic Bank*, 684 F.3d at 247-48. This tort requires an affirmative false statement; a mere omission will not suffice. *Associated Warehousing, Inc. v. Banterra Corp.*, 2009 WL 1856633 (W.D. Ky. June 24, 2009); *Giddings & Lewis, Inc. v. Indus. Risk Ins.*, 348 S.W.3d 729, 744-45 (Ky. 2011).

SBAV has pled numerous misstatements, as well as Defendants' "fail[ure] to exercise reasonable care or competence." (Docket No. 31 ¶ 77.) It further alleges that it relied upon Defendants' alleged misrepresentations in deciding to purchase the Bank's stock, (Docket No. 31 at ¶ 28.) The Amended Complaint explains that "[o]nce the Bank reformed its processes and procedures with respect to the valuation of its real estate assets and collateral, the proper classification of loans, and the appropriate reserves on account of properly classified assets, *it resulted in* a striking deterioration of the Bank's financial condition, its capital reserves, and its stock price." (Docket No. 31 at ¶¶ 56-57 (emphasis added).) Accordingly, SBAV has alleged a causal connection between the losses it suffered and Defendants' alleged misrepresentations.

Defendants argue that to the extent SBAV's negligent misrepresentation claim is based on statements outside of the bounds of the SPA and incorporated documents, the SPA's merger clause precludes such a claim. Section 6.2 of the SPA explains that the Transaction Documents comprise the entire understanding of the parties, superseding any prior oral or written representations.[3] According to Defendants, this merger clause precludes SBAV's negligent misrepresentation claim based upon misrepresentations made prior to the execution of the contract.

---

[3] *See* Docket No. 92-2 at § 6.2 ("The Transaction Documents, together with the Exhibits and Schedules thereto, contain the entire understanding of the parities with respect to the subject matter hereof and supersede all prior agree-

15

However, the merger clause does not give Defendants a virtual carte blanche to make misrepresentations without liability. A merger clause generally provides that the agreement is the complete, exclusive, and final embodiment of the parties' contract and excludes any prior understandings or parol evidence. *See KFC Corp. v. Darsam Corp.*, 543 F. Supp. 222, 224 (W.D. Ky. 1982). Such clauses preclude the admission of any evidence that serves to vary or contradict the written agreement. *Id.*

Here, however, SBAV does not attempt to vary the terms of the SPA; instead, SBAV points to the alleged misrepresentations that support a claim in tort for negligent misrepresentation. The parol statements upon which SBAV's negligent misrepresentation claim is grounded are not admissible to vary the terms of the writing, but they can serve as evidence of SBAV's independent tort claim. *See Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 259-61 (Ky. Ct. App. 2007) ("[N]either the parol evidence rule nor the merger and integration clauses in the contract precluded [the plaintiffs] from presenting evidence on their misrepresentation claim. . . . [S]ince a [fraudulent] misrepresentation claim sounds in tort rather than contract, the parol evidence rule does not apply."); *see also Ferris v. Tennessee Log Homes, Inc.*, 2009 WL 1506724 at *7 (W.D. Ky. May 27, 2009) (rejecting argument that plaintiffs could not have reasonably relied upon alleged misrepresentations in light of a merger clause and holding that "the merger clause… does not preclude reasonable reliance upon the alleged misrepresentations."). The Court agrees with SBAV that whether its reliance on Defendants' representations was reasonable is a question of fact for the jury. *See C.A.F. & Assocs., LLC v. Portage, Inc.,* 913 F. Supp. 2d 333, 353 (W.D. Ky. 2012). Therefore, the merger clause cannot establish a basis for dismissal of SBAV'S negligent misrepresentation claim.

---

ments, understandings, discussions and representations, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.")

**III.    SBAV's breach of contract claim survives Defendants' motion to dismiss.**

The motion before the Court is not the first Rule 12(b)(6) motion filed by Defendants. (*See* Docket Nos. 15, 34.)  Rules 12(g) and 12(h)(2) of the Federal Rules of Civil Procedure govern successive Rule 12(b) motions.  Rule 12(g) provides:

> If a party makes a motion under this rule but omits therefrom any defense or objection then available to the party which this rule permits to be raised by motion, the party shall not thereafter make a motion based on the defense or objection so omitted, except a omit ion as provided in subdivision (h)(2) hereof on any of the grounds there stated.

Fed. R. Civ. P. 12(g).

Rule 12(h)(2) provides:

> A defense of failure to state a claim upon which relief can be granted, a defense of failure to join a party indispensable under Rule 19, and an objection of failure to state a legal defense to a claim may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at trial on the merits.

Together, these rules prohibit a defendant from raising the defense of failure to state of claim after his initial 12(b) motion to dismiss unless that defense is made in the defendant's answer to the complaint, motion for judgment on the pleadings, or at trial.  Here, Defendants' Rule 12(b)(6) motion to dismiss SBAV's breach of contract claim does not fall into any of the three exceptions established in Rule 12(h)(2).  As the Sixth Circuit has explained, "Rule 12(h)(2), in setting out the ways in which a party may raise a failure to state a claim argument after the initial pre-answer motion, precludes the filing of a second 12(b)(6) motion to dismiss after an initial motion to dismiss." *Swart v. Pitcher*, 1993 WL 406802, at *3 (6th Cir. Oct. 8, 1993).

Defendants have offered no explanation for why this failure to state a claim argument was not raised in their pre-answer motions. Therefore, the instant motion is untimely and could be barred accordingly. However, there is no evidence indicating that the motion was filed only to delay the action or inconvenience SBAV. Neither is there reason to believe that the motion will prejudice or impose undue hardship upon SBAV. Because allowing Defendants' motion will not create unjust delay or facilitate an abuse in motion practice, the Court will address the merits of Defendants' motion to dismiss.

SBAV's Amended Complaint points to numerous representations in the SPA that it alleges were false when made and ultimately resulted in its losses. "To prove a breach of contact, the complaint must establish three things: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract." *Metro Louisville/Jefferson Co. Govt. v. Abma*, 326 S.W.3d 1, 7 (Ky. Ct. App. 2009) (citing *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 223 S.W.3d 723, 727 (Ky. App. 2007)). Having satisfied this requirement, SBAV's claim survives the motion to dismiss.

## CONCLUSION

Accordingly, for the reasons stated above, Defendants' motion to dismiss (Docket No. 92) is GRANTED as to all claims against PBI Bank. Defendants' motion to dismiss is DENIED as to all remaining claims. An appropriate Order will issue concurrently with this Memorandum Opinion.